WESTERN CHANCE # 2, INC., an
Arizona corporation, Plaintiff,

v.

KFC CORPORATION, a Delaware corpo-
ration, and KFC National Management
Company, a Delaware corporation, De-
fendants.

No. CIV 88–648 TUC ACM.

United States District Court,
D. Arizona,
Tucson Division.

Jan. 31, 1990.

George R. Brown, Robert J. Egielski, Linden, Chapa & Fields, Tucson, Ariz., for plaintiff.

Jeffrey Willis, Craig H. Kaufman, Streich, Lang, Weeks & Cardon, Tucson, Ariz., for defendants.

## MEMORANDUM OF DECISION

MARQUEZ, District Judge.

### INTRODUCTION

This is an action alleging breach of oral and written contracts (Counts One and Two) and the implied covenant of good faith and fair dealing (Count Three); tortious breach of the implied covenant of good faith and fair dealing (Count Four); fraud (Count Five); fraudulent inducement and misrepresentation (Count Six); promissory estoppel (Count Seven); and unconscionability (Count Eight). The action

arises out of a course of dealing between the parties which has spanned over twenty years, and which has now resulted in a dispute over the franchising rights for Kentucky Fried Chicken ("KFC") outlets in the city of Tucson, Arizona.

On January 23, 1989, the Court granted defendants' Motion for Summary Judgment on the punitive damages prayers in Counts One, Two and Three. On February 3, 1989, the Court granted defendants' Motion for Summary Judgment on Count Four (tortious breach of implied covenant of good faith and fair dealing). Defendants then moved for summary judgment on all remaining counts of the Complaint. Plaintiff opposed this motion, and cross-moved for partial summary judgment on Counts One, Two, Three and Seven. Both sides submitted extensive memoranda and supporting exhibits. The Court has decided this matter on the papers, without the necessity of oral argument. On December 4, 1989, the Court, by minute entry, granted defendants' motion and denied plaintiff's motion. This memorandum explains the reasons for the Court's decision.

### FACTS

*The Parties*

Plaintiff Western Chance # 2, Inc. is the franchisee and operator of one KFC outlet in Tucson. The shareholders, Walter H. Hill Jr., Jack L. Shettlesworth, W. Lynn Velde and Judith B. Velde, also established seven other Western Chance corporations to operate other KFC outlets in Tucson and southern Arizona. For purposes of the instant motions, Western Chance # 2, Inc. ("Western Chance") was assumed to be the alter ego of all other Western Chance entities and their common shareholders. (Statement of Undisputed Material Facts in Support of Motion for Summary Judgment ("DSOF") at 1, n. 1)

Defendant KFC Corporation is engaged in franchising KFC outlets, and is the party with whom Western Chance contracted to obtain the franchise rights for KFC outlets. Defendant KFC National Management Company ("KFC National"), a wholly-owned subsidiary of KFC Corporation, owns and operates numerous KFC outlets across the U.S., including two located within the Tucson metropolitan area. (Affidavit of Robert P. Steele ("Steele Affidavit"), Exhibit 1 to DSOF, at 1–2)

*The Oral Agreement*

On the first Monday after Thanksgiving, 1965, Walter Hill Jr. met in Shelbyville, Kentucky with Dick Robinson, who was then an employee in the Franchise Department of KFC Corporation. (Deposition of Walter Hill Jr. ("Hill depo") at 52:12–25; 53:1–5) At the time of this meeting, Hill had recently liquidated his interests in several Mr. Donut franchises located in Illinois and Indiana. (*Id.* at 60:12–16)

Hill told Robinson he wanted an "exclusive", somewhere he could go where the entire market would be his to develop. Robinson offered him Tucson, Arizona or Bridgeport, Connecticut. (Robinson depo at 42:6–10, 18–23; 44:14–16; 79:7–10) According to Robinson, "exclusive" meant that no one else could come in and develop a store in the area unless Hill agreed to it. (*Id.* at 18:12–24; 19:2–12; 54:9–21; 56:10–16; 57:19–25; 67:11–14) "The company had no right to open a store.... KFC's position was, they wanted no stores. They wanted franchisees. They did not want corporation stores." (*Id.* at 80:1–3; 58:11–14)

Hill paid $1000.00 to keep open the option on Tucson, traveled there to look it over, and eventually chose it. (Hill depo at 61:10–25) Hill and his partners [1] sent KFC Corporation two checks totalling $3000.00 for the options to develop six stores, which Robinson had determined was all the Tucson market would hold at that time. (Robinson depo at 35:6–14; 79:13–17)

According to Robinson, "[n]obody got a franchise from me that didn't get a letter from me stating exactly what we agreed to." (*Id.* at 30:10–12) Robinson would write such letters so that in the event of a "disagreement about anything, you could go back and look at the letter." (*Id.* at

---

1. Western Chance shareholder W. Lynn Velde has been an auto dealer and investor since 1945, with dealerships in Illinois and Florida. He is also involved in 21 chicken stores. (Deposition of W. Lynn Velde ("Velde depo") at 27:3–10; 29:9–19)

48:20, 21) In this case, Robinson wrote Hill a letter in January, 1966, acknowledging receipt of Hill's check for $1500.00 "to apply to the options for the city of Tucson ... this option is tentative until all paperwork is cleared and we can submit your application to our Executive Committee for final approval." (Letter of 1/11/66 from Robinson to Hill, Exhibit 8 to DSOF)

No mention was made in this letter of an exclusive territorial grant for the Tucson area; nevertheless, as far as Robinson was concerned, this letter reflected the arrangement for Hill to have an "exclusive" on Tucson. (Robinson depo at 52:4–10) The length of this territorial protection was the twenty year length of the franchise contract executed for the first franchise, the implication being that it would extend if that contract was renewed: "[a]s long as he was a franchisee, I would assume that the previous agreement would always be in effect." (*Id.* at 83:6–15; 35:15–18)

In February, 1966, Hill received a letter from Robinson's secretary Billie Wentworth. This letter confirmed receipt of $3000.00 from Hill and his partners for six options in Tucson, and contained a schedule for exercising the options. No mention was made of an exclusive territorial grant. The letter referred Hill for all future dealings to the Field Services Department of the executive offices of KFC in Nashville, Tennessee. (Letter of 2/24/66 from Wentworth to Hill, Exhibit 9 to DSOF) This letter represents the last contact Hill had with Robinson's office. (Hill depo at 87:10–17)

*The Original Five Franchise Contracts*

Hill and his partners exercised five of the six options for KFC outlets in Tucson. A separate Franchise Agreement was executed for each outlet. The partners employed an attorney in Illinois to review the contracts and advise them as to what those contracts meant. (Velde depo at 37:18–25; 38:1–25; 39:1–25; 40:8–11; 43:2–13; Hill depo at 94:19–25; 95:1–2) According to Lynn Velde, he exercised his own business judgment as to whether or not to sign a contract, after having it explained to him. (Velde depo at 43:2–17)

Each of the five contracts contained the following language regarding a grant of exclusive territory:

> [t]his grant is an exclusive grant with respect to that circular area which is determined by such minimum radius about the location as may be necessary to include either a population of Twenty Thousand (20,000) persons or a radius of one and one-half (1½) miles.

The contracts provided that KFC would "refrain from granting a franchise at any location within the LICENSEE'S [franchisee's] exclusive territory, except as provided by Paragraph III(a), entitled 'Term and Cancellation'". That paragraph enumerated KFC's rights in the event of a franchisee's non-compliance with the terms of the contract, after notice and failure to cure:

> LICENSOR [franchisor] may, at its option, in the event of such failure to cure within Thirty (30) days after notice, terminate ... the geographic exclusivity of this license and franchise....

The contracts all contained clauses providing that "[t]his Contract shall not be altered or amended except in writing executed by the parties." (Franchise Agreements of 9/1/66; 7/1/67; 4/1/68; 3/1/69; 4/15/70, attached as Exhibits 11–15 to DSOF [2])

*The G & K Litigation and Amendment*

In 1971, KFC was the defendant in a class action alleging certain violations of antitrust laws ("the G & K litigation"). This litigation was settled in 1972. Hill and Western Chance were members of the settling class. (Hill depo at 107:13–18) The settlement required KFC to offer contractual amendments to all franchisee members of the settling class, the effect of which would be to amend their existing franchise contracts ("the Amendment"). Each franchisee was free to accept or reject the Amendment, or to "delete any provisions you do not want." (Letters of

---

2. Because the terms of all five contracts are identical, only the first page of contracts two through five are attached. (Hill depo at 118:21–25)

8/10/72; 10/06/72; Cover Letter accompanying Amendment, Exhibits 17, 18 and 19 to DSOF) Western Chance accepted without change the entire Amendment with respect to all of its franchise agreements then in existence. (Hill depo at 106:1–11; 108:4–12)

The Amendment gave franchisees the right of first negotiation for a "new franchised outlet" (the proposed location of which was closer to an existing franchised outlet than any other outlet) before such franchise would be offered to a third party. The Amendment defined "franchised outlet" to mean "an outlet owned or operated by FRANCHISEE or any other franchisee but does not include Operating Company outlets." An "operating company outlet" was defined as "an outlet owned or operated by FRANCHISOR [KFC Corporation] or one of its subsidiaries [*e.g.*, KFC National]." (*See e.g.* 10/31/72 Amendment to Western Chance Franchise Contract of 9/1/66, Exhibit 20 to DSOF)

According to Hill, he did not strike any language in the Amendment prior to signing it because:

[a]t that time we did not think it would apply to us because we thought we had a market, the corporation would not come in and ask to build stores. We thought we had the market of Tucson, Arizona and that that was our market.

(Hill depo at 108:8–12)

*The Next Seven Contracts*

In April, 1974 Jack Shettlesworth applied to KFC for a seventh outlet on Tanque Verde Road in Tucson. He received a reply from the Franchise Sales Department which informed him that the application would be reviewed "in accordance with the enclosed Procedure Sheet", and that "this process may take as long as 60 days or more". (Letters of 4/16/74 and 4/19/74, Exhibits 22 and 23 to DSOF)

In May, 1974, the Western Chance shareholders executed a Franchise Contract for a sixth KFC outlet on North Oracle Road in Tucson. As with the original contracts, this contract granted to the franchisee territorial exclusivity within a radius of 1½ miles of the outlet or within the area surrounding the outlet which contained a pop-

ulation of 20,000. The contract expressly stated that "FRANCHISOR may at any time use or franchise others to use such System anywhere outside the smaller of such two circular areas." (Exhibit 16 to DSOF) An integration clause in the contract stated that

[t]his Agreement constitutes the entire Agreement of the parties (into which all prior negotiations, commitments, representations and undertakings with respect to the subject matter hereof are merged) ... the parties hereto acknowledge that there are no other oral or written understandings or agreements between them relating to the subject matter hereof.... No amendment or other modifications (sic) of this Agreement shall be valid or binding on either party hereto unless reduced to writing.... [NO ONE] HAS MADE ANY OTHER REPRESENTATION WHICH IS NOT EXPRESSLY SET FORTH HEREIN TO INDUCE FRANCHISEE TO ACCEPT THIS FRANCHISE AND EXECUTE THIS AGREEMENT.

(*Id.*) All seven of the franchise agreements executed between Western Chance and KFC after the settlement of the G & K litigation contained similar integration clauses.

In June, 1974, KFC sent Hill and Shettlesworth the Franchise Option Agreement for the seventh option, and copies of the Specimen Standard Franchise Agreement that would be executed for this outlet. The cover letter accompanying these documents stated:

[w]e recommend that you take the documents to your attorney in order that he may advise you as to the legal aspects of both [agreements].... THE FRANCHISE OPTION AGREEMENT IS NOT BINDING ON EITHER PARTY UNTIL IT HAS BEEN COUNTERSIGNED BY OFFICERS OF KFC CORPORATION. We caution you against incurring any obligations such as real estate leases or purchases until you have received your fully executed copy of the Franchise Option Agreement.

(Exhibit 24 to DSOF)

In October, 1974, Shettlesworth applied for an eighth option for an outlet on West

Valencia in Tucson. He again received from the KFC Franchise Sales Department a letter informing him that the approval process could take 60 days or more. (Exhibit 27 to DSOF) About thirty days later he received copies of the contracts, again with the recommendation that he take the documents to his attorney for review. (Exhibit 28 to DSOF)

The franchise contracts for the seventh and eighth outlets were executed in March and October of 1975, respectively. A franchise contract for a ninth outlet, on Golf Links Road in Tucson, was executed in October, 1976. (Exhibits 25 29, and 31 to DSOF) All of these contracts contained the same limited exclusive territorial grant with minimum radius 1½ miles or including population of 20,000. In 1982, Western Chance applied for a tenth franchised outlet on West St. Mary's in Tucson. The 1982 contract provided for the same limited territorial exclusivity, with population density 30,000 (up from 20,000). The 1982 contract also included the substance of the language from the G & K Amendment requiring KFC to first negotiate in good faith with the closest existing franchisee if a third party applied for a new franchised outlet. "New franchised outlet" was defined as "an outlet not previously in existence, whether franchised or owned by KFC or its affiliates, and which will not be owned by KFC or its affiliates". (Exhibit 33 to DSOF)

On October 6, 1982, KFC sent Shettlesworth copies of the agreements for the tenth option/outlet. The cover letter accompanying these documents stated that "this [St. Mary's] location cannot be held unless we receive the [signed] agreements from you by [October 26]." The letter further stated that

> [w]e are contemplating entering into the Franchise Option Agreement and franchise relationship with you based on our understanding that our dealings will be governed exclusively by the Franchise Option Agreement and Franchise Agreement.... If you are relying on any other statements made by us, whether oral or in writing, we need to know that at this time. To this end, we need you to complete the section at the bottom of this

letter and to sign and return a copy with the signed agreements.

Shettlesworth signed the letter, after checking a box next to the following statement:

> I am not relying on any statements made by your company or its employees except those contained in the Franchise Option Agreement, the Franchise Agreement and the franchise disclosure. I will continue to make my own independent decisions in connection with getting my Kentucky Fried Chicken restaurant open and will not rely on any statements made by KFC. I fully understand that any such statements are intended to assist me but are not intended to induce me to enter into the franchise or to open the outlet.

(Exhibit 35 to DSOF)

In July, 1985, Shettlesworth received a letter from KFC notifying him of the proposed establishment of a new franchised outlet in Green Valley, Arizona (closer to a Western Chance outlet than to any other), and inviting him to submit an application for the franchise. The letter contained the following language:

> [y]ou realize, of course, that your application ... must be approved before we can offer you an option for the new location. KFC reserves the final right to determine whether or not a franchise is granted for this location, to whom such franchise may be granted, or whether to place a company-owned store at such location.

(Letter of 7/10/85, Exhibit 36 to DSOF)

In September, 1985, Shettlesworth received a letter from KFC reviewing issues discussed at a meeting held earlier that month between Shettlesworth and the Regional and District Directors for Franchise Services. The letter stated that "to insure you understood the territory protection outlined in your franchise agreement, we explained the clause; it's 1½ mile radius or 20,000 people whichever comes first." (Exhibit 40 to DSOF)

In December, 1985, Hill, in connection with the applications for two additional KFC franchised outlets, signed a letter identical to that signed by Shettlesworth in

1982, after checking the box next to the statement that disclaimed reliance on any statements other than those contained in the franchise agreements. (Exhibit 39 to DSOF) Those agreements, for franchises in Green Valley and in Tucson at the intersection of Ina and Thornydale, contained the same limited territorial protection as the previous ten. They also contained the substance of the Amendment language requiring KFC to negotiate with the closest franchisee if a third party applied for a new franchised outlet. These two agreements also contained a new clause which provided as follows:

> [r]ecognizing the value of uniform national standards to franchisee, KFC and the franchise system, franchisee shall from time to time abide by any reasonable requirement of KFC with regard to the remodeling and upgrading of the outlet to comply with standards then applicable to new franchises and stores owned by KFC and its affiliates, provided, however, that such requirements shall not impose an undue economic burden.

(Exhibits 41, 42 to DSOF)

*The Settlement and Release*

On June 18, 1987, KFC sued Western Chance in federal district court in Kentucky to enforce the termination of the franchise for the outlet on Golf Links Road, which had been closed by the Pima County Health Department. (Complaint, attached to Steele Affidavit as Exhibit 1 to DSOF) Later that month, Hill, Shettlesworth and their attorney Ed Linden met in Lake Tahoe with various KFC executives and in-house counsel for KFC. At the meeting, discussions were held regarding the Golf Links franchise, the breach by Western Chance of the Franchise Option Agreement for the outlet at Ina and Thornydale (by failure to timely begin construction), and Western Chance operations in Tucson generally. (Hill depo at 240:13–25; 243:6–25; 244:1–25; 245:1–25; 246:1–8)

As a result of this meeting, the parties executed an Agreement of Compromise, Settlement and General Release ("General Release") entered into by all Western Chance entities and shareholders, KFC Corporation and KFC National. (Exhibit 46 to DSOF) Western Chance was represented by an attorney during the drafting of the General Release, and would not have agreed to it without his advice and participation. (Hill depo at 249:22–25; 250:1–13)

The General Release contained the following language:

12. *General Release by Western Chance*

Western Chance, with the express intention of effecting a General Release and the extinguishment of all obligations between the parties as herein designated does hereby release, discharge, and acquit KFC, and its respective officers, trustees, agents, employees, representatives, affiliated, parent, and subsidiary corporations, from any and all claims, demands, causes of action, and liabilities of every kind and nature, known and unknown, suspected and unsuspected, held by Western Chance and relating to the subject matter of the litigation or any other matter involving his franchise and commercial relationship with KFC....

14. *Representations and Warranties of Western Chance*

b) Western Chance has received independent legal advice ... with respect to the advisability of making the Settlement provided for herein, and with respect to the effect of the General Release on any an (sic) all claims they may have.

c) ... Western Chance [does not] rely upon any statement, representation, or promise of KFC, or of any officer, trustee, agent, employee, representative, or attorney for KFC in executing this General Release or in making the settlement provided for herein, except as provided herein.

h) Western Chance represents and warrants that no person or legal entity has any claims or demands outstanding against KFC which arise out of or are incident to the claims or demands which are the subject of the Action, nor which arose out of or are in any way connected with the KFC franchise relationship between the parties.

(Exhibit 46 to DSOF at 11–12, 13, 14–15)
As part of the General Release, Western

Chance agreed to relinquish its franchise for the Ina & Thornydale location, and to waive its right of first negotiation under the G & K Amendment, thus allowing KFC to franchise that location to a third party if KFC so chose. (Exhibit 6 to Statement of Undisputed Material Facts in Opposition to Defendants' Motion for Summary Judgment ("PSOF") at 3, 4)

*Subsequent Events*

Hill and Shettlesworth met with KFC Corporation employees in Tucson on December 10, 1987. At this meeting, KFC representative Paul Hanson told Hill and Shettlesworth that KFC was interested in a buy-out of Western Chance. They responded that Western Chance was not interested in selling. (Hill depo at 251:20–25; 252:9–23) Hill and Shettlesworth met again with KFC Corporation employees in Santa Ana, California on February 9, 1988 and June 30, 1988. At each of these three meetings, Hill and Shettlesworth were informed of KFC National's plans to open company-owned outlets in Tucson. At no time during any of the meetings did Hill or Shettlesworth communicate to the KFC representatives that they believed they had an exclusive right to open KFC outlets in the Tucson area. (Hill depo at 258:17–19; 254:25; 255:1–15; 288:13–25; 289:1–25; 290:1–25; 292:1–25; 293:1–25; 294:12–25; 295:1–8; deposition of Jack Shettlesworth ("Shettlesworth depo") at 260:18–25; 261:1–4; 267:10–14)

In the early fall of 1988, KFC National opened a company-owned outlet near Ina and Shannon. KFC National also acquired a site near Valencia and Cardinal, and opened a second company-owned outlet in December, 1988. (Steele Affidavit at 2) Western Chance filed its Complaint in this matter on September 14, 1988.

DISCUSSION

*Standard for Granting Summary Judgment*

Summary judgment is proper if there are no questions of material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *accord, Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (summary judgment appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party"). Once the moving party has met the initial burden of showing that no genuine issue of material fact exists, "the nonmoving party has the subsequent burden of presenting significant probative evidence tending to support its claim that material, triable issues of fact remain." *Ferguson v. Greater Pocatello Chamber of Commerce*, 848 F.2d 976, 979 (9th Cir.1988).

As the following discussion indicates, KFC has met its burden of showing that no triable issue of fact exists in this case. Western Chance has not met its corresponding burden, and therefore the Court finds that KFC is entitled to summary judgment as a matter of law.

*The Oral Agreement is Unenforceable.*
*Statute of Frauds*

■ The parties disagree as to whether a contract was ever entered into between Messrs. Hill and Robinson. Even if the Court finds as a matter of law that at their meeting in November of 1965, Hill and Robinson agreed that Hill would have the exclusive right to open KFC outlets in Tucson, the agreement is unenforceable. This agreement was clearly not to be performed within one year of its making. Regardless of whether it was theoretically possible to open the first six KFC outlets optioned by Western Chance within one year, the exclusive territorial grant was itself either perpetual or of twenty years duration, and as a matter of law falls within the statute of frauds. It was never reduced to writing.

■ The two letters sent from Robinson's office to Hill are inadequate to satisfy the requirement of the statute that they reasonably identify the subject matter of the oral agreement. There is no mention made in either letter of an exclusive territorial grant of the city of Tucson from KFC to Hill. In fact, the grant of the six options is made expressly contingent on approval from the Executive Committee. Western Chance urges the Court to interpret the letters with reference to extrinsic

evidence; specifically, a paragraph describing Franchise Operations in the HISTORY AND BUSINESS section of KFC's 1966 PRELIMINARY PROSPECTUS. (Exhibit A to Supplemental Statement of Facts in Opposition to Defendants' Motion for Summary Judgment ("PSSOF"))[3] This evidence is insufficient as a matter of law to supply the missing element from the correspondence; namely, reference to an *exclusive* territorial grant. The oral agreement is unenforceable, pursuant to the statute of frauds. *See* A.R.S. § 44–101.

■ The oral agreement is not taken out of the statute by part performance. The part performance here was not "unequivocally referable solely to the oral contract". *William Henry Brophy College v. Tovar,* 127 Ariz. 191, 194, 619 P.2d 19, 22 (App. 1980). Rather, the part performance was referable to the acquisition of six options confirmed in writing and purchased for $500.00 per option; to the execution of six Standard Form options; and to the execution of the five original Franchise Contracts.[4]

■ Nor is Western Chance entitled to relief under the doctrine of promissory estoppel, as alleged in Count Seven of the complaint. The principal loss which could be suffered by Western Chance as a result of its inability to enforce the oral agreement is the loss of the expected benefits of that agreement. This level of detrimental reliance is insufficient to override the policy and effect of the statute of frauds. *Johnson v. Gilbert,* 127 Ariz. 410, 414, 621 P.2d 916, 920 (App.1980).

■ More importantly, the elements of promissory estoppel include the requirement of *justifiable* reliance by the promissee. *See Trollope v. Koerner,* 106 Ariz. 10, 18, 470 P.2d 91, 99 (1970) (en banc). The reliance by Hill and Western Chance in

this case on the oral agreement with Robinson was not justifiable as a matter of law, and will not support a claim of promissory estoppel. Hill met with Robinson once, in 1965, and may also have spoken with him several times by telephone. No other Western Chance shareholder ever met with Robinson. After receiving the second letter from Robinson's office in February, 1966, which referred him for all future dealings to the Field Services Department of KFC, *Hill had no further contact with Robinson.* (Hill depo at 87:4–24)

During the next twenty-three years, Western Chance representatives executed twelve separate franchise agreements, as well as renewals of some of those agreements. They signed and accepted an Amendment to all franchise agreements in existence in 1972. They received correspondence from KFC explaining the limits of their territorial protection. Each of these documents contained provisions which directly contradicted the existence of an oral exclusive territorial grant of Tucson from KFC to Western Chance. At least eight of them also contained integration clauses.

Western Chance representatives signed documents in 1982 and 1985 which expressly stated that they were not relying on any oral statements by any KFC employee relating to any aspect of the acquisition of new franchises not expressly contained in the written franchise agreements. In 1987, Western Chance executed a General Release of all claims, "known and unknown, suspected and unsuspected", pertaining to the franchise relationship between the parties. The Release also contained an affirmation by Western Chance representatives that when executing the Release, Western Chance relied on no statements by KFC

---

**3.** The referenced language reads as follows: "... a substantial number of contracts covering urban areas grant to the franchisee the *exclusive* right to open more than one outlet within his area, and require the franchisee to open a minimum number of outlets at locations approved by the Company within specified periods of time." (emphasis supplied)

**4.** The remaining KFC outlets were opened by Western Chance pursuant to a procedure where-

by Hill or one of his partners submitted an option request and tendered a fee for each application. If the request was approved, a fully integrated Franchise Contract was executed for the outlet. Hill understood that "just by sending in your $500.00 check and your request for an option, didn't automatically meant that you were going to get that option." (Hill depo at 177:25; 178:1–4)

representatives other than those contained in the Release itself.

The shareholders of Western Chance employed legal counsel to review the franchise agreements and advise them as to whether to sign. Western Chance was also represented by legal counsel during the negotiation and drafting of the General Release. Western Chance representatives met with KFC employees on various occasions over the years to discuss business operations in Tucson. It is not justifiable that the Western Chance shareholders would rely on Robinson's oral grant of the city of Tucson to Hill during a meeting held in 1965, and never once in the following twenty-two [5] years (during which time Robinson left KFC, and the corporation itself changed ownership) raise the question to a KFC employee or even to their own attorneys "how does this [franchise contract/G & K Amendment/Settlement and Release] affect our oral exclusive grant that we got from Dick Robinson in 1965?" The remedy of promissory estoppel is not available to Western Chance under these circumstances.

### Parol Evidence Rule

■ The terms of the oral agreement granting city-wide territorial protection are irreconcilable with the 1½ mile or population density protection provided for in every written franchise agreement executed by Western Chance.[6] Significantly, every franchise agreement executed by Western Chance representatives after their acceptance of the G & K Amendment included an integration clause. Evidence of the oral agreement is inadmissible to alter the terms of the written contracts. *See Spudnuts, Inc. v. Lane,* 131 Ariz. 424, 426–27, 641 P.2d 912, 915 (App.1982) (evidence of statements squarely against the terms of a written agreement inadmissible under the

parol evidence rule); *Sun Lodge, Inc. v. Ramada Development Company,* 124 Ariz. 540, 542, 606 P.2d 30, 32 (App.1980) (same); *Pinnacle Peak Developers v. TRW Investment Corp.,* 129 Ariz. 385, 392–93, 631 P.2d 540, 546–48 (App.1980) (parol evidence barred admissibility of oral representations contradicting written agreement where parties were experienced in business transactions and represented by counsel); Restatement (Second) of Contracts § 213 comment c, illustration 4 (1981). *See also Eichman v. Fotomat Corp.,* 871 F.2d 784, 797 (9th Cir.1988) ("[A]s a general rule where there is no express grant of an exclusive territory in a contract or franchise agreement, none will be impliedly read into the contract.").

■ Western Chance argues, citing *Darner Motor Sales v. Universal Underwriters,* 140 Ariz. 383, 682 P.2d 388 (1984), that the written integration clauses contained in the franchise contracts should not be given effect because they are boilerplate provisions which were not negotiated. Western Chance's reliance on *Darner* is misplaced. In that case, the Arizona Supreme Court sought to protect consumers from having their "reasonable expectations" vitiated by standardized language contained in mass-produced contracts. The court observed that

> [w]e have adopted a rule of law which, in proper circumstances, will relieve the insured from certain clauses of an agreement *which he did not negotiate, probably did not read, and probably would not have understood had he read them.*

*Darner,* 140 Ariz. at 394, 682 P.2d 388 (emphasis supplied).

In the instant case, Western Chance shareholders Hill and Lynn Velde were sophisticated businessmen with previous franchise experience. They employed legal

---

**5.** Shettlesworth first told a KFC employee of his belief that Western Chance had the exclusive right to open KFC outlets in Tucson within the year preceding his December, 1988 deposition. He was told that that was not the case, in the employee's opinion. (Shettlesworth depo at 91:10–24; 92:18–25; 93:1) Neither Hill nor the Veldes mentioned the alleged oral agreement to any KFC employee prior to the filing of the Complaint in this matter. (Velde depo at

110:22–25; 111:1–8; Hill depo at 258:17–19; 254:25; 255:1–15; 288:13–25; 289:1–25; 290:1–25; 292:1–25; 293:1–25; 294:12–25; 295:1–8)

**6.** KFC's "right to terminate ... the geographic exclusivity of this license and franchise" (Exhibit 11 to DSOF) would be meaningless if, in addition to the limited exclusivity granted by the franchise contract, Western Chance was also entitled to city-wide exclusivity.

counsel to review the franchise contracts and to advise them as to what those contracts meant. Velde, after receiving an explanation of the contracts from his attorney, exercised his own business judgment as to whether or not to sign. The Western Chance shareholders were sufficiently informed and competent to object to the integration clauses if they so chose. The rule enunciated in *Darner* was not meant to apply to such a situation as this.

### Effect of General Release

■ In 1987 Western Chance entered into a General Release with KFC, the effect of which was to extinguish all obligations between the parties regarding

> any and all claims, demands, causes of action and liabilities *of every kind and nature, known and unknown, suspected and unsuspected, held by Western Chance and relating to ... any matter involving his franchise and commercial relationship with KFC....*

(Exhibit 46 to DSOF, emphasis supplied) At the time of the execution of this Release, Western Chance was aware that its claim of exclusive territorial rights to the Tucson market was contradicted by the limited territorial protection granted in each integrated franchise contract. Almost two years earlier, Western Chance had received a letter from KFC stating that "to insure you understood the territory protection outlined in your franchise agreement, we explained the clause; it's 1½ mile radius or 20,000 people whichever comes first." (Exhibit 40 to DSOF) Western Chance was represented by legal counsel when negotiating and drafting the Release. Even if the Court were to find that Western Chance had a right to rely on the alleged oral agreement, Western Chance's execution of the Release extinguished that right.[7]

7. The Release also extinguished Western Chance's other claims regarding the breach of the written contracts and the implied covenant of good faith and fair dealing; fraud; fraudulent inducement/misrepresentation; and unconscionability. All of these claims are based on language in contracts which were in effect at the time the Release was executed. Nevertheless, the Court addresses each of these claims

The oral agreement is unenforceable pursuant to the foregoing discussion. Therefore KFC was not in breach of the agreement, or of the implied covenant of good faith and fair dealing arising from it, when it began opening company-owned KFC outlets in Tucson in 1988.[8]

*KFC did not Breach the Terms of the Written Contracts or the Implied Covenant of Good Faith and Fair Dealing.*

■ Western Chance claims that KFC and KFC National have breached the terms of the written franchise agreements, and the implied covenant of good faith and fair dealing, by opening company-owned outlets in Tucson. Specifically, Western Chance focuses on the definition of "new franchised outlet" in ¶ 19 of the most recent franchise agreements executed between the parties. (*See e.g.* Franchise Agreement for West St. Mary's outlet dated 10/07/82, Exhibit 33 to DSOF; Renewal of Franchise Agreement for West Valencia outlet dated 8/23/85 at 20, Exhibit 3 to DSOF) ¶ 19 obligates KFC to negotiate in good faith with the closest existing franchisee to a "new franchised outlet" before the franchise for the new outlet is offered to a third party. "New franchised outlet" is defined as "an outlet not previously in existence, whether franchised or owned by KFC or its affiliates, *and which will not be owned by KFC or its affiliates.*" (*Id.*) (emphasis supplied).

Western Chance has alleged that this definition includes company-owned outlets, and that therefore KFC is in breach of the written contracts by not negotiating with Western Chance prior to the opening of company-owned outlets in Tucson. KFC disputes this interpretation of ¶ 19, maintaining that it does not apply to company-owned outlets. Western Chance argues that the language in ¶ 19 is ambiguous, and that at the very least a material issue of

*infra,* concluding on grounds independent of the Release that KFC is entitled to summary judgment as to each of them.

8. Western Chance alleges that KFC took this action in response to Western Chance's refusal in December, 1987 to sell its Tucson outlets. Even if this were true, it would not change the legal rights of the parties.

fact exists as to the interpretation of the language and its applicability to company-owned outlets.

Whether the terms of an agreement are ambiguous is a question of law. *Sun–Air Estates, Unit 1 v. Manzari,* 137 Ariz. 130, 131, 669 P.2d 108, 109 (App.1983). The Court finds that the language in ¶ 19 is not ambiguous, and that no material issue of fact exists as to its interpretation. While perhaps not as well drafted as it might be, the language is clear in its application to new outlets which will not be owned by KFC or its affiliates. The written contracts will be enforced according to their terms. *See McLane & McLane v. Prudential Ins. Co.,* 735 F.2d 1194, 1195 (9th Cir. 1984) (applying Arizona law); *Isaak v. Mass. Indemnity Life Ins. Co.,* 127 Ariz. 581, 584, 623 P.2d 11, 14 (1981) (en banc).

Pursuant to the language in ¶ 19, KFC and KFC National have the right to open and operate new KFC outlets in Tucson as long as they do not infringe on the limited exclusive territorial grant contained in the written franchise agreements (i.e. the smaller of minimum radius 1½ miles, or minimum radius necessary to include 20,-000 people). There has been no showing that they have breached the written agreements, or the implied covenant of good faith and fair dealing, by opening the company-owned outlets mentioned above.

*Western Chance has Failed to Prove all the Necessary Elements of a Claim of Fraud.*

■ Each of the franchise agreements executed after 1982 contained a provision requiring the franchisee to remodel and upgrade outlets in recognition of "the value of uniform national standards to franchisee, KFC and the franchise system". Western Chance has alleged that because KFC is now opening company-owned outlets in Tucson, the remodeling and upgrading of several outlets undertaken by Western Chance in 1987 is of no value to Western Chance, and the above-quoted provision constitutes fraud by KFC.

In order to state a cause of action for fraud, a plaintiff must establish a concurrence of elements including, *inter alia,* the falsity of the representation made, and his reliance on its truth. *Staheli v. Kauffman,* 122 Ariz. 380, 383, 595 P.2d 172, 175 (1979). Based on the undisputed facts, Western Chance has failed to prove all of the necessary elements of its claim of fraud, and KFC is therefore entitled to summary judgment on this claim. Specifically, Western Chance cannot establish the falsity of the representation contained in the franchise contracts regarding the value of uniform national standards to the franchisee, nor can the Western Chance shareholders establish that they relied on its truth.

The shareholders did not upgrade and remodel Western Chance outlets in 1987 in reliance on the representation that such "image enhancement" would be beneficial to them. They did it because they were bound to do it by the terms of the General Release, and by the terms of the individual franchise contracts. Furthermore, even assuming that Western Chance did rely on this representation, there is nothing to indicate that it was false.[9] That the subsequent opening by KFC of two company-owned outlets in Tucson may have diminished some of Western Chance's profits does not change the fact that at the time Western Chance expended funds to upgrade and remodel, that expenditure benefitted the enterprise.

*Western Chance has Failed to Prove all the Necessary Elements of a Claim of Fraudulent Inducement/Misrepresentation.*

■ Western Chance has alleged that it was fraudulently induced to accept the 1972 Amendment to its franchise agreements, and the later-executed agreements which incorporated provisions of the Amendment. Specifically, Western Chance argues that it relied on the definition of "new franchised outlet" as including company-owned outlets. Western Chance's

---

**9.** In his deposition, Jack Shettlesworth agreed that "it is important for franchise operations that all of the [KFC] stores have a good image ... if people had bad experiences in one KFC restaurant, it's likely to taint their impression of all KFC restaurants regardless of where they are located." (Shettlesworth depo at 237:5–13)

theory is that the definition of "franchised outlet" in the Amendment excludes only *operating* company outlets, not outlets *to be* owned or operated by KFC, and therefore the Amendment provision requiring KFC to negotiate with the closest existing franchisee applied to new outlets contemplated for company ownership.

This argument ignores the context in which the definition of "franchised outlet" appears. The contested provision reads: "[b]efore permitting the establishment of any *new* franchised outlet at a location closer to FRANCHISEE'S outlet than to any other franchised outlet...." (Article V of Amendment dated 10/31/72, Exhibit 20 to DSOF (emphasis supplied)) It is clear from the language of the provision that it was meant to apply to outlets that had not yet been opened. In this context, "operating company outlet" is an outlet *to be* owned or operated by KFC.

The later-executed agreements were even clearer; they specifically defined "new franchised outlet" to mean that "which will not be owned by KFC or its affiliates". The fact that Western Chance held a mistaken belief regarding the interpretation of this language cannot form the basis of a claim of fraudulent inducement or misrepresentation.

■ Western Chance further argues that statements made by KFC in correspondence preceding and accompanying the Amendment to the effect that its provisions were intended to benefit the franchisee constituted fraudulent misrepresentations, since the Amendment provision exempting KFC from the duty to negotiate with the closest existing franchisee for the establishment of company-owned outlets does not benefit Western Chance. This argument lacks merit. Prior to signing the Amendment, the Western Chance representatives were given the opportunity to delete any provisions they did not want. They declined to delete anything, apparently believing that any unfavorable provisions simply "didn't apply" to them.[10]

10. *See* Hill depo at 108:8–12.

*The Terms of the Amendment are not Unconscionable.*

■ Western Chance has alleged that the terms of the Amendment, in its original form and as incorporated into subsequent franchise agreements, are unconscionable. An unconscionable contract provision typically results from "overreaching by the party with superior bargaining power", and contains clauses that "are so one-sided as to be unconscionable under the circumstances existing at the time of the making of the contract". *Seekings v. Jimmy GMC of Tucson, Inc.*, 130 Ariz. 596, 602, 638 P.2d 210, 216 (1982) (en banc).

As a matter of law, the "right of first negotiation" provision disputed by Western Chance is not so one-sided as to be unconscionable. This provision, in fact, conditionally *extends* the territorial protection contained in the pre-existing franchise agreements (minimum radius necessary to contain 20,000 people or minimum radius of 1½ miles) by requiring KFC to negotiate with Western Chance if a third-party franchisee seeks to open an outlet closer to a Western Chance outlet than to any other. In addition, Western Chance was given absolute discretion to accept or reject this provision prior to signing the Amendment.

Western Chance's position is that the bargaining process resulting in its acceptance of the new franchise agreements (which incorporated the "right of first negotiation" provision of the Amendment) was inequitable because Western Chance had no choice but to sign the contracts or lose its outlets, and because KFC concealed its intent regarding the construction of the language of the provision. The latter argument has been previously addressed; the language speaks for itself, and there was nothing for KFC to conceal.

As to the former argument, the Court again observes that Western Chance shareholders Hill and Lynn Velde were sophisticated businessmen with previous franchise experience. They had been dealing at arms length with KFC for years prior to the negotiation of these contracts. They employed legal counsel to review the con-

tracts and advise them. Under these circumstances, it cannot be said that the bargaining process between the parties was inequitable.[11] Though enforcement may be harsh, a valid contract must be given full force and effect. *Isaak*, 127 Ariz. at 584, 623 P.2d 11; *G & S Investments v. Belman*, 145 Ariz. 258, 268, 700 P.2d 1358, 1368 (App.1985).

CONCLUSION

This decision has explained the Court's reasoning in granting KFC's Motion for Summary Judgment. In its Cross Motion for Partial Summary Judgment, Western Chance raised essentially the same arguments as those herein addressed by the Court. This decision therefore also disposes of Western Chance's Partial Motion for Summary Judgment on the merits.

---

11. Significantly, Western Chance shareholders took advantage of the very provision they now challenge as unconscionable when they used their "right of first negotiation" to apply for and acquire a franchise in Green Valley. Having thus asserted the provision on their own behalf, they are estopped to deny its enforceability. *See Triste v. Industrial Commission,* 25 Ariz.App. 489, 492, 544 P.2d 706, 709 (1976).