595 P.2d 172

Paul STAHELI and Julie Staheli, husband and wife, Appellants,

v.

Herbert KAUFFMAN and Carolyn Kauffman, husband and wife, Appellees.

No. 13945.

Supreme Court of Arizona, In Division.

May 10, 1979.

Norling, Rolle, King & Oeser by Kenneth Skiff, Thinnes & Rawles by Thomas A. Thinnes, Thomas V. Rawles, Phoenix, for appellants.

Favour & Quail by John M. Favour, Prescott, for appellees.

STRUCKMEYER, Vice Chief Justice.

This is an appeal by Paul and Julie Staheli from an order of the Superior Court granting appellees' motion for judgment notwithstanding the verdict. Judgment of the Superior Court affirmed.

This suit was brought by Paul Staheli and his wife Julie in two counts; first, for breach of contract, and, second, for fraud. After trial in the Superior Court of Maricopa County, a verdict was directed against the Stahelis on the first count and the count of fraud was submitted to the jury. The jury returned a verdict of $2,000.00 actual damages and $30,000.00 punitive damages against appellees. The trial court being of the opinion that it had erroneously submitted the question of fraud to the jury, granted the Kauffman motion for judgment notwithstanding the verdict, ruling that the facts as presented in the case were not such as to permit reliance by the plaintiffs and therefore the evidence was not sufficient to support an action for fraud.

The evidence taken most strongly in favor of sustaining the jury's verdict, *In re Stitt's Estate*, 93 Ariz. 302, 380 P.2d 601 (1963), establishes the following. In July, 1973, Herbert Kauffman, a professor at San Francisco State University in California, called Julie Staheli in Los Angeles to ask whether her husband, Paul, would accept employment as the manager of Kauffman's cattle ranch located near Cordes Junction, Arizona. Paul Staheli was working on a motion picture set as a designer when Kauffman telephoned. He had helped Kauffman during a liquidation sale of cattle earlier in the year, and had indicated to Kauffman that he was interested in a change for himself and his family. Julie told Kauffman to call back when Paul had finished his present job.

About a month later, Kauffman called again and repeated his offer. Paul told Kauffman he was interested in managing the ranch, but that he did not want to work merely for wages. He said he wanted to acquire a partnership interest in the ranch. Kauffman replied that he would talk the situation over with his wife and call back. When Kauffman telephoned a third time, Paul testified that they agreed there was to be "some sort of a partnership arrangement" and:

"Q And that is the conversation in which Herb told you that you would get

$600 a month, and in addition to your wages, he would furnish you a house and he would furnish you insurance?

A He would furnish me the money, and it was my choice whether to use it for insurance or whether to have it for cash in pocket.

\* \* \* \* \* \*

Q And he told you that in addition to your wages, you would not only have this insurance benefit, but would have a house to live in rent free?

A That's right. He also told me we would work out a limited partnership. That was the whole purpose of calling back.

Q Right. And you and he said, 'We'll talk about this when we get to Millbrae.'

A Yes."

Paul arrived at Millbrae, California a week after the last phone call. He testified:

"Q Did you discuss a partnership in Millbrae?

A I think we discussed my managing the ranch and living on the ranch and working on the ranch in terms of a partnership.

\* \* \* \* \* \*

Q What was there about this limited partnership that you were to get in these discussions?

A There was never—until I got to Arizona, there was never any discussion about what I was to get. Operation of the ranch was to be—I would be operating the ranch as a limited partner. If the discussions were couched in those terms.

Q What did you understand a limited partner to be?

A Well, it was my understanding that a limited partner was someone who owned much less than 50 percent of a corporation or of any sort of business. I didn't know the percentage."

Appellants moved to Arizona in late August and Paul commenced his employment as ranch manager. When Kauffman arrived from California a few days later, the partnership arrangement was discussed, and according to Paul:

"Well, he put forth propositions, what I assumed to be binding terms in that he said, his proposal in terms of being able to build up a partnership agreement was that we were to receive $200 a month. That would be placed into a trust fund that after six months half could be drawn out. After—and I don't remember if it was one or two years—all could be drawn out, or the money could be used to acquire a portion of the ranch." [1]

On September 3, 1973, immediately after his return to California, Kauffman sent a letter to the Stahelis in which he wrote:

"Although it may be repetitious of matters already spoken about, I'll enumerate the minimum conditions of your employment for the time being.

1. That you are provided with a decent domicile and the expenses of maintaining it fall on the ranch.

2. That your base salary is $600.00. In addition you will receive $42.00/mo for medical and hospital insurance. That you be enrolled in social security and the way of paying that should be discussed.

3. Your job began Aug. 20, 1973. For the last eleven days of Aug. I paid you $200.00 and advanced $100.00 for expenses. \* \* \*

4. As far as a trust agreement leading to a partnership is concerned, I'll draw up a draft of that for you to think about. You may have some ideas about this which you can write about or save until I get there."

It was therefore made clear at this point to appellants that appellees did not consider their discussions concerning a partnership had resulted in a definite, firm agreement.

---

1. The trial court directed a verdict against the Stahelis on the first count of their complaint for damages for breach of contract on the grounds that the agreement was void as it was not in writing and hence within the statute of frauds. The lower court's action in this respect has not been assigned as error on appeal.

Later, the Stahelis and Kauffman engaged in further discussions. They talked about alternate plans; for example, the possibility of compensating appellants with a percentage of the calf crop. In December there was a meeting in the Phoenix office of Western Farm Management, where Kauffman and Paul Staheli sought advice on a partnership agreement. At that time Paul Staheli inquired whether a trust account had been set up for him. Kauffman told him that it had not and that it had become necessary to put up part of the ranch for sale in order to raise cash to continue the operation. Subsequently, a number of prospective purchasers were shown around the ranch by Paul.

In the first week in June, the parties had a meeting at which Kauffman told Paul that he was unable and unwilling to carry out any plan to give the Stahelis a partnership interest in the ranch. He also told Paul not to "count on" employment after September.

■ In considering whether the evidence taken in its strongest light establishes actionable fraud, the plaintiffs must show a concurrence of nine elements, which are:

" '(1) A representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) his intent that it should be acted upon by the person and in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) his reliance on its truth; (8) his right to rely thereon; (9) his consequent and proximate injury.' " *Carrel v. Lux*, 101 Ariz. 430, 434, 420 P.2d 564, 568 (1966); *Nielson v. Flashberg*, 101 Ariz. 335, 338–39, 419 P.2d 514, 517–18 (1966).

■ In order that a representation constitute actionable fraud, it must relate to either a past or existing fact. It cannot be predicated on unfulfilled promises, expressions of intention or statements concerning future events unless such were made with the present intention not to perform. *Waddell v. White*, 56 Ariz. 420, 428, 108 P.2d 565 (1940); *Law v. Sidney*, 47 Ariz. 1, 5, 53 P.2d 64 (1936). "Were the general rule other-

wise, every breach of contract could be made the basis of an action in tort for fraud." *Lloyd v. Smith*, 150 Va. 132, 145, 142 S.E. 363, 365 (1928).

Arizona's Court of Appeals has pointed out:

"A primary reason given for the rule not permitting predication of fraud on promises which are not subsequently kept is that a promise to perform in the future is not a representation which can be shown to be true or false at the time it was made, and therefore, a person has no right to rely, in a legal sense, on a representation of a fact not in existence." *Denbo v. Badger*, 18 Ariz.App. 426, 428, 503 P.2d 384, 386 (1972).

■ Appellants' position is that once Kauffman made an unconditional promise to work out a partnership agreement, the failure to reach mutually agreeable terms is not a bar to a claim of fraud. But we think appellants did not have the right to rely on the appellees' promise to work out a partnership because such a promise is not sufficiently definitive to determine what was being promised.

Appellants rely on *Ahmed v. Collins*, 23 Ariz.App. 54, 530 P.2d 900 (1975). There, Collins, a quadriplegic, contacted Ortho Comfort Stores and inquired about an orthopedic bed. Ortho's salesman, Pauk, promised Collins that if she made a down payment on the bed of $366.00, she would receive the bed in two weeks and credit financing on the balance. She never received the bed, nor was she given credit financing. She brought the suit for fraud, and the jury found in her favor. On appeal, the court held:

"* * * a jury could reasonably conclude that the representations of Pauk, which dispelled the doubt in Collins' mind as to the availability of financing, was tantamount to an assertion of fact that, if she would make a down payment of $366, Ortho would extend credit for the balance. *In this context, such representation could reasonably be classified as relating to an existing fact.*

\* \* \* The jury could well find \* \* that she was led to believe Ortho was extending credit to her." 23 Ariz.App. at 57, 530 P.2d at 903. (Emphasis added.)

In the case at bar, Paul testified that from the beginning the parties agreed that "we would work out a limited partnership." The promise by appellees of a partnership was clearly conditional on finding an arrangement satisfactory to both. The Kauffman promise was not definitive and obviously dependent for its future vitality on further negotiations. It is not the kind of a promise which a promisee has the right to rely on in a claim of fraud.

We said in *Trollope v. Koerner*, 106 Ariz. 10, 19, 470 P.2d 91, 100 (1970):

"It is worth bearing in mind that charging fraud is a serious matter, and it should never be alleged routinely, as a makeweight or as a hoped-for panacea for an otherwise imperfectly perceived remedy."

Judgment affirmed.

HAYS and HOLOHAN, JJ., concur.