## INDEPENDENT DRUG WHOLE-SALERS GROUP, INC., a Delaware Corp., Plaintiff,

v.

## Lawrence DENTON, et al., Defendants.

### No. 92–2164–JWL.

United States District Court, D. Kansas.

Aug. 27, 1993.

Memorandum Denying Reconsideration Oct. 7, 1993.

W. Joseph Hatley, Lathrop & Norquist, Overland Park, KS, Marisa V. Lindell, Graham & Dunn, Daniel Gandara, Seattle, WA, for Independent Drug Wholesalers, Chris Osmers, Brad Jones.

Mark D. Hinderks, Stinson, Mag & Fizzell, Overland Park, KS, Teresa L. Clark, Stinson, Mag & Fizzell, Kansas City, MO, Michael J. Coffman, Zackery E. Reynolds, Fort Scott, KS, Michael P. Morton, Wilmington, DE, for Lawrence Denton, Pharmacy Dispensing Quantities, Inc.

Mark D. Hinderks, Stinson, Mag & Fizzell, Overland Park, KS, Kevin F. Mitchelson, Wheeler & Mitchelson, Chtd., Pittsburg, KS, Teresa L. Clark, Stinson, Mag & Fizzell, Kansas City, MO, Steve A. Leben, Law Offices of Steve Leben, Overland Park, KS, Michael J. Coffman, Fort Scott, KS, for Mark Denton.

Mark D. Hinderks, Stinson, Mag & Fizzell, Overland Park, KS, Teresa L. Clark, Stinson, Mag & Fizzell, Kansas City, KS, Michael J. Coffman, Fort Scott, KS, for Russell Craig Campbell, American Home Pharmacy, Inc.

Russell Craig Campbell, pro se.

Mark D. Hinderks, Stinson, Mag & Fizzell, Overland Park, KS, Teresa L. Clark, Stinson, Mag & Fizzell, Kansas City, KS, Gregory L. Musil, Shughart, Thomson & Kilroy, Overland Park, KS, Michael J. Coffman, Fort Scott, KS, for Rudolph Villegas.

Zackery E. Reynolds, Fort Scott, KS, Michael P. Morton, Wilmington, DE, for Hurst–Asher Drug Inc., Camden Enterprises.

James C. Fowler, Graham & Dunn, Seattle, WA, for Brad Jones.

### MEMORANDUM AND ORDER

LUNGSTRUM, District Judge.

#### I. Introduction

This matter comes before the court on the motion of defendant Larry Denton for summary judgment (Doc. # 215); the motion of Camden Enterprises ("Camden"), Hurst–Asher Drug, Inc. ("AHP"), and Pharmacy Dispensing Quantities, Inc. ("PDQ") for summary judgment (Doc. # 217); the motion of defendant Mark Denton for summary judgment (Doc. # 211); and the motion of plaintiff Independent Drug Wholesalers Group, Inc. ("IDWG"), cross-defendant Chris Osmers, and cross-defendant Brad Jones for summary judgment (Doc. # 209). IDWG has also moved for leave to file a supplementary memorandum in opposition to defendant's motions for summary judgment (# 241).

This case involves Racketeer Influenced and Corrupt Organization Act, 18 U.S.C. § 1961 et seq. (RICO) and common law claims by a pharmaceutical drug distributor against its repackaging contractor related to the repackager's alleged theft of pharmaceutical "overages."[1] For the reasons set forth below, Larry Denton's motion is denied, the motion of Camden Enterprises, et al., is denied and Mark Denton's motion is denied. IDWG's motion for leave to file a supplementary memorandum is granted and its contents have been considered. The motion of IDWG, et al., for summary judgment is denied in part and granted in part.

---

1. According to the parties, when a pharmaceutical manufacturer sends bulk pharmaceuticals to a distributor, it often sends a small excess of product over the amount ordered. For example, on a 5000 tablet order, the manufacturer may send 5075 tablets. This excess over the amount ordered is known as an "overage."

## II. Facts

The following facts are uncontroverted for purposes of these motions for summary judgment.[2]

Plaintiff IDWG is a cooperative consisting of 62 local and regional prescription drug wholesalers. IDWG buys prescription drugs in very large quantities from pharmaceutical manufacturers and uses contractors such as defendant Pharmaceutical Dispensing Quantities ("PDQ") to repackage them into smaller quantities which are then shipped to its members across the country. PDQ performed this repackaging and shipping service for IDWG from sometime before September 1990 until around February of 1992. In addition to repackaging for IDWG, PDQ also repackaged for other drug wholesalers, including Humiston Keeling and Morrison & Dickson.

Larry Denton is the President and an owner of PDQ. Camden Enterprises is a partnership owned by defendant Larry Denton and defendant Craig Campbell. Camden owns the real estate on which AHP is located and PDQ was previously located. AHP is a retail pharmaceutical operation owned by Camden Enterprises.

In May, 1990, the board of IDWG decided that PDQ's $2,000,000 in products liability insurance was insufficient and required PDQ to acquire $10,000,000 in insurance and name IDWG as a named insured under the policy. Whether or not IDWG made an oral contract that allowed PDQ to keep all non-Motrin overages as compensation for PDQ's increased products liability insurance is a central issue in this lawsuit. IDWG admits that there was an oral agreement between IDWG and PDQ that PDQ could keep all less than full bottle overages of all products. However, IDWG contends that PDQ was not allowed to take full bottle overages of any products.

The parties operated for a time without a formal contract. In September, 1990, the parties executed a formal repackaging agreement which did not mention ownership or procedure with regard to overages. After the contract was executed, the business between the parties grew substantially and both parties' businesses grew accordingly. PDQ's production grew from less than 50,000 bottles per month in October, 1990 to over 300,000 bottles per month in January, 1992. IDWG's gross receipts grew from $1.3 million in 1990 to $79.2 million in 1992.

In September, 1991, Brad Jones, an IDWG vice president, was placed in charge of the IDWG repack program. Mr. Jones occasionally visited the PDQ facility and had access to all batch records at PDQ. The utility of those batch records in determining the existence and quantity of overages is in controversy.

C.D. Smith, among other companies, purchased overages from PDQ.

Mark Denton, Larry Denton's son, had no managerial responsibilities at PDQ until after he graduated from the University of Kansas in May, 1991. He was not involved in negotiations which led to the execution of the contract in September, 1990.

In late May, 1991, Mark became Chief of Operations at PDQ and oversaw operations, training, and FDA compliance. He trained the hourly employees to separate all overages from IDWG inventory and store them in an electrical room. At least some of the Motrin overages were returned to IDWG inventory. None of the written policies of PDQ, either before or after Mark became Chief of Operations, contained any instructions regarding overages. PDQ ceased separating out IDWG overages beginning in February, 1992.

In early February, 1992, Chris Osmers of IDWG offered to purchase PDQ. Larry

---

**2.** Although IDWG followed local rule 206(c) by specifically denying certain numbered paragraphs of the various defendants' statements of uncontroverted facts, IDWG failed to "refer with particularity to those portions of the record upon which the opposing party relies" in controverting those statements. D.Kan.Rule 206(c). However, IDWG did refer to the record in a section called "Evidence Relied Upon by IDWG." To the extent that the court can determine which of the defendants' uncontroverted statements are controverted by IDWG's statements of "Evidence Relied Upon by IDWG", those statements will be treated as controverted for purposes of this motion.

Denton, President of PDQ, perceived this offer as a "hostile takeover attempt." On February 26, 1992, the FDA shut down PDQ's plant and seized all the inventory, including over $8 million worth of inventory belonging to IDWG. Thereafter, Brad Jones, IDWG Vice President, worked with PDQ personnel to rework the IDWG inventory in order to release it from the FDA seizure. During this period, PDQ also packaged a small amount of non-seized product.

On March 10, 1992, Mr. Osmers and Larry Denton met in Washington, D.C. At that time, Denton told Osmers that "he would rather liquidate than sell PDQ to him" and Osmers conveyed to Denton that there was "a very good chance that IDWG would not continue to do business with PDQ."

About March 16, 1992, IDWG was contacted by C.D. Smith Co., who mistakenly thought that IDWG had sold certain drugs to C.D. Smith. After investigation, IDWG learned that PDQ had sold the drugs which originated from IDWG. Thereafter, IDWG considered PDQ and its principals to be thieves.

On March 24, 1992, Larry Denton wrote a letter to Chris Osmers asking Osmers for a written statement regarding the future of the relationship between IDWG and PDQ. Osmers did not respond to that letter. Osmers did not promise to continue to do business with PDQ after the FDA rework was completed.

On May 4, 1992, the rework was completed and IDWG filed this lawsuit shortly thereafter. PDQ has been unable to obtain additional work and Larry Denton believes that his company has been blackballed by the industry by IDWG accusing it of RICO violations and theft.

### III. Standard for Summary Judgment

When considering a motion for summary judgment, the court must examine all the evidence in the light most favorable to the nonmoving party. *Langley v. Adams County, Colorado,* 987 F.2d 1473, 1476 (10th Cir.1993). A moving party who bears the burden of proof at trial is entitled to summary judgment only when the evidence indicates that no genuine issue of material fact exists. Fed.R.Civ.P. 56(c); *Anthony v. United States,* 987 F.2d 670, 672 (10th Cir.1993). If the moving party does not bear the burden of proof at trial, it must show "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986).

Once the movant meets these requirements, the burden shifts to the party resisting the motion to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). The nonmovant may not merely rest on the pleadings to meet this burden. *Id.* Genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250, 106 S.Ct. at 2511; *Tersiner v. Union Pacific R.R.,* 740 F.Supp. 1519, 1522–23 (D.Kan. 1990). More than a "disfavored procedural shortcut," summary judgment is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.' Fed.R.Civ.P. 1." *Celotex,* 477 U.S. at 327, 106 S.Ct. at 2555.

### IV. RICO Claims Against Larry Denton, Camden, and AHP

Defendants Larry Denton, Camden, and AHP bring motions for summary judgment on plaintiff IDWG's claims against them for violations of the RICO statute. The plaintiff's claims arise from alleged violations of 18 U.S.C. § 1962(a) (the investment of income derived from racketeering activity), § 1962(c) (engaging in racketeering activity), and (d) (conspiracy to violate § 1962(a) & (d)). 18 U.S.C. § 1962(c) provides:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

In order to state a claim under § 1962(c), the plaintiff must prove (1) conduct (2) of an

enterprise (3) through a pattern (4) of racketeering activity. *Sedima, S.P.R.L. v. Imrex Co., Inc.,* 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985).

Defendants Larry Denton, Camden, and AHP argue that the plaintiff has failed to establish that there are genuine issues of material fact concerning whether there was a pattern of racketeering activity or the defendants committed the requisite predicate acts. For the reasons set forth below, this court finds that the plaintiffs have sufficiently established a pattern and predicate acts to withstand a motion for summary judgment. Defendants Camden and AHP also allege that they are "enterprises" for purposes of RICO and cannot be held liable as "persons." For the reasons set forth below, the court finds that PDQ is the only "enterprise" alleged for purposes of § 1962(c) and that Camden and AHP may be held liable as "persons."

*A. The Pattern Requirement*

The court finds that the plaintiff has established a pattern of racketeering activity by defendant Larry Denton, defendant AHP, and defendant Camden. 18 U.S.C. § 1961(5) provides that a "pattern of racketeering activity"

> requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years ... after the commission of a prior act of racketeering activity.

In *H.J., Inc. v. Northwestern Bell,* the Supreme Court addressed the pattern requirement of RICO and held that in order to prove a pattern of racketeering activity, a plaintiff must prove that the racketeering acts are related and that they amount to or pose a threat of continued criminal activity. 492 U.S. 229, 239, 109 S.Ct. 2893, 2900, 106 L.Ed.2d 195 (1989). The defendants attack the adequacy of evidence to support the "continuity" prong of the pattern requirement and not the "relatedness" prong.

The Supreme Court set out two methods of proving continuity, closed-ended and open-ended:

> "Continuity" is both a closed-ended and open-ended concept, referring to either a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition. It is, in either case, centrally a temporal concept.... A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time. Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement: Congress was concerned with long-term criminal conduct.

*Id.* at 241–42, 109 S.Ct. at 2902.

■ The defendants argue that there can be no continuity because only a single scheme, i.e. stealing overages, enacted against a single victim, i.e. IDWG, is alleged. However, in setting the boundaries for "continuity" in *H.J.,* the Court explicitly rejected the Eighth Circuit's requirement that a plaintiff had to prove that the defendants were involved in multiple schemes to prove a RICO claim. *Id.* at 240, 109 S.Ct. at 2901.

The defendants rely on *Boone v. Carlsbad Bancorporation, Inc.,* to support their argument that IDWG does not have evidence which support "continuity." 972 F.2d 1545 (10th Cir.1992). In *Boone,* the Tenth Circuit stated the following in discussing the continuity requirement:

> Plaintiffs [fail to state a claim because they] allege what is actually a closed-ended series of predicate acts constituting a single scheme (the transfer of a debt) to accomplish a discrete goal (the merger) directed at a finite group of individuals (CNB shareholders) "with no potential to extend to other persons or entities."

*Id.* at 1556 (citing *Sil–Flo, Inc. v. SFHC, Inc.),* 917 F.2d 1507, 1516 (10th Cir.1990). In contrast to *Boone,* IDWG alleges, and has some evidence in its support, that PDQ and the defendants were stealing overages from more than a single entity, i.e. they were taking overages without authorization from two other pharmaceutical wholesalers, Humiston Keeling and Morrison & Dickson and, therefore, whether or not there were multiple victims is a factual issue. Also, in *Boone,*

the focus of all the alleged predicate acts was a single transaction, i.e. a merger, where here the alleged predicate acts relate to a series of transactions in which PDQ processes individual shipments of pharmaceuticals for various wholesalers and takes their overages. Therefore, *Boone* does not require summary judgment on the plaintiff's RICO claims.

The defendants also argue that as a matter of law the court cannot allow a RICO claim to go forward when it relates to a "basic contract dispute." They then cite *Sil–Flo, Inc. v. SFHC, Inc.*, 917 F.2d 1507, 1516 (10th Cir.1990) and *Condict v. Condict*, 826 F.2d 923, 927–29 (10th Cir.1987) as well as other cases from other circuits and district courts to support their position that the circuits have developed a rule of law that no RICO claim can be made when one of the disputes between the parties is contractual in nature. In each of the cases cited by the defendants, the courts analyzed the facts according to the elements set out by the Supreme Court in *Sedima, S.P.R.L.* and the relevant analysis concerning the existence of a pattern. In each of the cited cases, a pattern was found not to exist, not because a contract was in dispute, but because the requirements of a pattern were not shown by the plaintiff or plaintiffs. None of these courts has announced the rule of law which the defendants rely upon but merely commented that due to the lack of a pattern, a RICO claim could not be made and only some type of contract dispute remained.

### B. Predicate Acts

█ The defendants argue that there is no evidence of the predicate acts alleged by the plaintiff. IDWG alleges that defendants Larry Denton, AHP and Camden engaged in (1) interstate transportation of stolen goods, (2) receipt of stolen goods after interstate transportation, (3) mail fraud, (4) wire fraud and (5) money transactions resulting from unlawful activities. As the defendants state:

> Obviously, all of these claims are dependent upon an allegation that PDQ did not own the overages. If PDQ owned the overages, there were no "predicate acts."

Unfortunately for the defendants, there are genuine issues of material fact concerning whether IDWG or PDQ owned the overages. This is a central factual issue in the case. Because the defendants have not shown an absence of evidence to support the existence of predicate acts, summary judgment is not proper on the basis of lack of predicate acts.

█ Defendant Camden Enterprises further argues that IDWG has not pled with requisite particularity any predicate acts on the part of Camden. Rule 9(b) of the Federal Rules of Civil Procedure applies to RICO predicate acts based on fraud and provides that "[in] all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R.Civ.P. 9(b); *Farlow v. Peat, Marwick, Mitchell & Co.*, 956 F.2d 982, 989 (10th Cir. 1992). Plaintiff IDWG has specifically alleged and has some evidence to show that Camden Enterprises engaged in the laundering of monetary instruments under 18 U.S.C. § 1956(a)(1)(B) & (a)(1)(B)(i) on at least two occasions. The court finds the complaint is sufficient and denies Camden's motion for summary judgment on this ground.

### C. Enterprise Requirement

Defendants Camden and AHP have moved for summary judgment on the basis that they are not proper RICO defendants. They argue that they are "enterprises" for purposes of IDWG's RICO claims and therefore cannot also be "persons" within the meaning of the statute. The court finds that Camden and AHP are proper defendants because they are "persons" within the meaning of § 1962 and summary judgment is denied on this ground.

█ As with the "pattern of racketeering activity," the term "enterprise" is not defined in the statute. Section 1961(4), however, provides a range of examples included within the concept:

> "enterprise" includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity.

The term is broad, but important restrictions on its scope exist. In order to be an "enterprise" under § 1962(c) an alleged association must have an identity separate and apart from the alleged pattern of racketeering. *Saine v. A.I.A., Inc.,* 582 F.Supp. 1299, 1303 (D.Colo.1984).

■ Plaintiff has alleged that PDQ is the "enterprise" through which racketeering activities took place and that Camden and AHP are "person[s] employed by or associated with" the "enterprise"—i.e., PDQ. *See* § 1962(c). There are no RICO claims asserted against PDQ. Pharmacy Dispensing Quantities, Inc. is a legal entity that fits squarely within the meaning of an "enterprise" under § 1962.

Camden and AHP mistakenly assert that because they may be considered "enterprises" in one sense of the word, they cannot also be "persons" within the meaning of the statute. Section 1961(3) states that a " 'person' includes any individual or entity capable of holding a legal or beneficial interest in property." Camden and AHP, as a partnership and corporation respectively, are legal entities capable of holding an interest in property. They are therefore proper "persons." Defendants' rely on *McMurty v. Brasfield,* 654 F.Supp. 1222 (E.D.Va.1987) and *Kaufman v. Chase Manhattan Bank,* 581 F.Supp. 350 (S.D.N.Y.1984), for the proposition that they cannot be "persons" because they are also "enterprises." Their reliance is misplaced. These cases merely hold that a defendant cannot be both the enterprise and the person alleged in a § 1962(c) claim, i.e., the enterprise must exist separate and apart from the racketeering activity. Camden and AHP are not alleged to be the "enterprises" through which racketeering activity was conducted, PDQ is.[3] Thus, this is not a situation in which the defendant or "person" and the "enterprise" are one and the same and defendants' motion for summary judgment is denied on this basis.

[3.] Plaintiff does allege that AHP is an "enterprise" for purposes of § 1962(a). The Tenth Circuit has held, and the majority of courts agree, that the person and enterprise need not be

### V. RICO Claim against Mark Denton

Defendant Mark Denton brings a motion for summary judgment on plaintiff IDWG's claim against him for aiding and abetting defendants Larry Denton, Camden and AHP as principal actors in the RICO violations. For the reasons set forth below, this motion is denied in part and granted in part.

#### A. Underlying Violations and Specific Intent

Mark Denton first argues that he cannot be liable as an aider and abetter because IDWG has failed to prove an underlying violation of RICO by the principal actors. As explained in Part *IV* the court finds that the plaintiff has established a pattern of racketeering activity by defendants Larry Denton, Camden, and AHP, and therefore will not dismiss the RICO claim against Mark Denton on the ground that there is no underlying violation of § 1962.

Second, Mark Denton argues that the substantive RICO allegations against him are specific intent crimes and that he may be held liable as an aider and abetter only if he shared in the criminal intent of the principals. He then argues there is no evidence of any specific intent on his part to defraud.

■ The defendant correctly asserts that proof of criminal intent is a necessary element of plaintiff's claim. The Fifth Circuit described the requirements of aider and abetter liability in *Armco Industries Credit Corp. v. SLT Warehouse Co.:*

> To prove a [defendant's] association with [mail fraud] there must be evidence that [the defendant] shared in the criminal intent of the principals. Proof of mere negative acquiescence is insufficient, there must be evidence that [the defendant] committed an overt act designed to aid in the success of the venture.

782 F.2d 475, 485 (5th Cir.1986). Silence that permits a racketeering scheme to continue is not enough. *Id.* at 486.

separate or distinct under § 1962(a). *Garbade v. Great Divide Mining & Milling Corp.,* 831 F.2d 212 (10th Cir.1987).

There are, however, genuine issues of material fact concerning whether Mark Denton possessed the requisite criminal intent. IDWG alleges more than mere silence and acquiescence on the part of the defendant. There is evidence that Mark Denton took overages and trained his employees to take stolen overages and hide them in a separate room at PDQ. Plaintiff IDWG has offered evidence that Mark Denton altered PDQ's operating procedures to conceal the keeping of overages by PDQ. There is sufficient evidence in the record from which a jury may infer that Mark Denton, as PDQ's Chief of Operations, was aware that the overages were not the property of PDQ and that the storage and subsequent resale of certain overages was concealed from IDWG. Thus, summary judgment is denied on this ground.

### B. Single v. Multiple Victims

Defendant Mark Denton further argues that the alleged racketeering activity involved only a single scheme affecting one victim and that such a closed-ended scheme cannot constitute a pattern. This argument lacks merit. For one, the Supreme Court rejected the multiple scheme requirement in *H.J. Inc. v. Northwestern Bell Telephone Co.,* 492 U.S. 229, 232, 109 S.Ct. 2893, 2897, 106 L.Ed.2d 195 (1989). The Court found that "Congress intended to take a flexible approach and envisaged that a pattern might be demonstrated by reference to a range of different ordering principles or relationships between predicates, within the expansive bounds set." *Id.* at 238, 109 S.Ct. at 2900. Second, the defendant has failed to show that a reasonable juror could not find that there was more than one wholesaler from whom overages were taken w/o authorization. Whether there were multiple victims remains an issue of fact. Mark Denton's motion for summary judgment is denied on this basis.

### C. Length of Time

Finally, defendant Mark Denton argues that IDWG cannot prove a pattern of racketeering activity because the length of his participation in the scheme is simply too short to amount to "continued criminal activity" under RICO. For the reasons set forth below, the court finds that plaintiff IDWG has shown a sufficient pattern of racketeering activity on the part of Mark Denton and denies the defendant's motion for summary judgment.

In order to prove a pattern exists, a plaintiff must prove that the racketeering acts are related and that they amount to or pose a threat of continued criminal activity. *H.J., Inc. v. Northwestern Bell,* 492 U.S. 229, 239, 109 S.Ct. 2893, 2900, 106 L.Ed.2d 195 (1989). When there is no threat of on-going criminal activity, a plaintiff must demonstrate a series of related predicate acts extending over a substantial period of time. *Id.* at 241, 109 S.Ct. at 2901. In a closed-ended scheme, predicate acts extending over a few weeks or months do not satisfy the pattern requirement. *Id.* Defendant correctly asserts that in many cases activity spanning less than a year has been held insufficient to satisfy the continuity requirement of RICO. *See e.g., Aldridge v. Lily–Tulip, Inc.,* 953 F.2d 587 (11th Cir.1992) (conduct construed as lasting one year was too brief a period of time); *Hindes v. Castle,* 937 F.2d 868 (3d Cir.1991) (declines to draw an exact line, but eight months insufficient). However, no bright line test exists and periods of activity less than nine months have been held to be sufficient. *See e.g., Polycast Technology Corp. v. Uniroyal, Inc.,* 728 F.Supp. 926 (S.D.N.Y.1989) (pattern found where complaint alleges 26 acts of mail, wire and securities fraud over 8½ months). The Tenth Circuit has not defined a bright line test, but instead has developed a flexible standard and common sense approach:

We find that two factors are particularly relevant to the determination of continuity. First, because continuity is "centrally a temporal concept," we consider the duration of the related predicate acts. Second, we consider the extensiveness of the RICO enterprise's scheme. Multiple on-going activities are more likely to satisfy the continuity requirement than would be several sporadic, albeit still related, acts. Under the rubric of "extensiveness," we consider a number of factors: the number of victims, the number of the racketeering acts, the variety of racketeering acts, whether

the injuries caused were distinct, the complexity and size of the scheme, and the nature or character of the enterprise or unlawful activity. In assessing continuity, we analyze these factors with the goal of achieving a "natural and commonsense result."

*Resolution Trust Corporation v. Stone,* 998 F.2d 1534 (10th Cir.1993) (citations omitted).

■ It is uncontroverted that defendant Mark Denton was involved in the alleged racketeering activity for a period of nine months. Mark Denton became Chief of Operations of PDQ in May of 1991 and both plaintiff and defendants agree that PDQ ceased taking overages following the FDA seizure of all drug products in the PDQ facility in February of 1992. Although Mark Denton's involvement was less than one year, the alleged racketeering scheme was extensive. Mark Denton's involvement was ongoing not sporadic, he committed many alleged racketeering acts, and there has been some evidence of multiple victims. The court finds this activity meets the "continuity" prong of the pattern requirement. Thus, Mark Denton's motion for summary judgment is denied on all grounds.

### VI. Fraud Claims Against Mark Denton, Larry Denton, and AHP

■ The plaintiffs have alleged fraud on the part of Mark Denton, Larry Denton, and AHP. In order to state a claim for fraud, a party must allege an untrue statement of fact, known to be untrue by the party making it, which is made with the intent to deceive, where another party justifiably relies on the statement and acts to their injury and damage. *Albers v. Nelson,* 248 Kan. 575, 579, 809 P.2d 1194 (1991). However, fraud also "includes affirmative acts and misstatements of fact or the concealment of acts or facts which legally or equitably should be revealed." *Id.* Concerning fraud by silence, the Kansas courts have stated that fraud may "encompass anything calculated to deceive, including all acts, omissions and concealments involving a breach of a legal or equitable duty and resulting in damage to another." *Goben v. Barry,* 234 Kan. 721, 676 P.2d 90 (1984).

■ Defendant Mark Denton contends that he has made no false statements of material fact and his mere silence and "head nodding" is insufficient to support a fraud claim. IDWG, however, has set forth evidence that Mark Denton took overages and concealed this act by failing to take overages when IDWG personnel were present. A jury could reasonably conclude that Mark Denton engaged in "acts intended to deceive." Whether or not Mark Denton intended to deceive IDWG is also a genuine issue of material fact, thus Mark Denton's motion to dismiss the fraud claim against him is denied.

■ Defendants Larry Denton and AHP similarly argue that the fraud claims against them must be dismissed because neither defendant made false statements to IDWG. Once again, IDWG alleges and has evidence to show that Larry Denton individually, and Larry Denton and Campbell as the sole shareholders of AHP, concealed the taking of overages as well as the quantity of overages taken. Larry Denton and AHP further argue that they had no duty to disclose the amount of overages because the overages were the property of PDQ. Once again, whether the overages were the property of PDQ is the central issue of this lawsuit. A genuine issue of material fact exists as to whether Larry Denton was entitled to keep the overages and whether he purposefully failed to disclose the existence and amount of overages. The court denies defendant Larry Denton's motion for summary judgment of this ground. Similarly, AHP's motion for summary judgment on the fraud claim is denied as there is sufficient evidence for a reasonable juror to find that AHP, by and through Larry Denton and Campbell, actively concealed the sale of stolen overages.

### VII. Fraud Claim Against Osmers, Jones, and IDWG

IDWG, Osmers, and Jones move for summary judgment on PDQ's fraud claim against them. PDQ claims that defendants defrauded it by promising both expressly and by silence to continue business relations after the rework of IDWG's products was com-

plete. The claim is based on alleged misrepresentations and omissions by Brad Jones and Chris Osmers. For the reasons set forth below, the court denies in part, and grants in part, the summary judgment of the claims against Osmers and IDWG. The court grants summary judgment in favor of Jones.

*A. Claim Against Jones—Affirmative Misrepresentations*

▬ PDQ alleges and has some evidence to show that Brad Jones made affirmative misrepresentations of fact, i.e. that he told PDQ personnel and made vague references to Larry Denton that IDWG would continue to do business with PDQ after the FDA seizure. PDQ has failed to show, however, that there is a genuine issue of material fact as to its reliance on these statements. Larry Denton specifically testified in his deposition that he did not rely on any statements from Brad Jones:

Q. But you certainly wouldn't go to the bank or borrow money or invest money based upon employee rumors, would you?

A. No, I would not.

Q. You wanted to get the information from the horse's mouth, didn't you?

A. Yes.

Q. You wanted Chris Osmers to tell you, point blank, whether he was going to do business with you or not?

A. Exactly.

Q. And on what terms?

A. Yes.

Q. And you wanted it in writing?

A. Correct.

Q. Okay. Because you weren't going to rely on these impressions and rumors concerning Brad Jones, right?

A. Right.

Depo. Larry Denton Vol. 1 p. 148–49. Thus, PDQ cannot establish a key element of its fraud claim. The court grants summary judgment on this ground.

*B. Claim Against Osmers and IDWG—Affirmative Misrepresentations*

The fraud claim with respect to statements made by Chris Osmers is more complicated. In Larry Denton's deposition, in response to counsel's questions, he definitively stated that at no time did Osmers promise to do business with PDQ after the rework period. Depo. Larry Denton Vol. 1 p. 152. However, in a subsequent affidavit filed with this court Larry Denton states that after working out a consent decree, Osmers specifically told him that IDWG would continue to do business with PDQ following the rework process. This affidavit directly conflicts with Larry Denton's previous testimony and the court finds that to the extent the affidavit attempts enter evidence that Osmers affirmatively and unmistakenly *promised* IDWG would do business with PDQ after the rework period, it shall be disregarded.

▬ Rule 56(e) provides that summary judgment motions may be supported by affidavits. Generally, a witness' affidavit may not be disregarded simply because it conflicts with a prior deposition. *See* 10A C. Wright, A. Miller & M. Kane, Federal Practice & Procedure § 2738, at 473–74 (2d ed. 1983). However, a court may disregard an affidavit that directly conflicts with prior testimony when the court finds the affidavit presents a "sham" issue of fact rather than a genuine issue of fact. *Franks v. Nimmo,* 796 F.2d 1230, 1237 (10th Cir.1986); *see also Rohrbough v. Wyeth Laboratories, Inc.,* 916 F.2d 970, 974–5 (4th Cir.1990); *Foster v. Arcata Associates, Inc.,* 772 F.2d 1453, 1462 (9th Cir.1985); *Biechele v. Cedar Point, Inc.,* 747 F.2d 209, 215 (6th Cir.1984); *Van T. Junkins & Associates, Inc. v. U.S. Industries, Inc.,* 736 F.2d 656, 657–58 (11th Cir. 1984); *Camfield Tires, Inc. v. Michelin Tire Corp.,* 719 F.2d 1361, 1364 (8th Cir.1983); *Perma Research & Development Co. v. Singer Co.,* 410 F.2d 572, 578 (2d Cir.1969). Factors relevant to the existence of a sham fact issue include whether the affiant was cross-examined during his earlier testimony, whether the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence, and whether the

earlier testimony reflects confusion which the affidavit attempts to explain. *Franks,* 796 F.2d at 1237.

■ The court finds that there is no triable issue of fact as to whether Osmers specifically promised to do business with PDQ after the rework period. Larry Denton testified in his deposition to the following:

Q: At any time did Chris Osmers promise you that he was going to do business with you after the rework period?

A: No.

Q: At any time did anyone representing IDWG promise you that IDWG was going to do business with you after the rework period?

A: I think that was the point of this (indicating).

Q: I understand. I just want the record to be clear. the answer's no, correct?

A: Correct.

Depo. Larry Denton Vol. 1 p. 152–53. In his subsequent affidavit Larry Denton states, "Immediately after working out the consent decree, Chris Osmers told me that IDWG would continue to do business with PDQ following the rework process." Larry Denton Aff. p. 3. Applying the factors set out in *Nimmo,* supra, it is apparent that only a "sham" issue of fact exists and the court will not consider evidence that Osmers promised to continue to do business. Larry Denton's previous testimony was very clear and there is no confusion in the deposition that needs to be explained. The affidavit offers no supporting facts to explain either the striking contradiction or the circumstances of the newly remembered 'promise.' Larry Denton was a participant in the alleged conversations so he had access to all pertinent facts and this is not a case in which new evidence has been discovered.

■ However, although the court finds that there was no promise to do business after the rework, the fraud claim based on affirmative misrepresentations is not dismissed. The court finds, based on Larry Denton's deposition and other evidence (not including the affidavit), that there is an issue of fact as to whether Osmers and IDWG promised to negotiate with IDWG after the rework process. There has also been sufficient evidence to show that at the time the promise to negotiate was allegedly made, IDWG in fact had no intent to negotiate continued business with PDQ. Further, the court finds, based on evidence in the record, that whether PDQ reasonably relied on these alleged statements by Osmers, i.e. by not seeking other clients, is a genuine issue of material fact for the jury. Similarly, whether there were damages stemming from this reliance cannot be decided as a matter of law. Osmers and IDWG's motion for summary judgment to dismiss the fraud claim is denied on this basis.

## C. Claim Against IDWG, Osmers and Jones—Failure to Speak

PDQ claims IDWG and Osmers committed fraud by failing to reveal their intentions to cease business relations with PDQ after the rework period. IDWG, et al., move for summary judgment on this claim and argue that they had no duty to speak. For the reasons set forth below, summary judgment is granted on this claim.

■ A failure to disclose material facts is only fraud when there is a legal or equitable duty to communicate such facts:

Actionable fraud may be based ... upon a suppression of facts which the party is under a legal or equitable obligation to communicate and in respect of which he could not be innocently silent.

*DuShane v. Union Nat'l Bank,* 223 Kan. 755, 759, 576 P.2d 674 (1978). An obligation to communicate arises from the relationship existing between the parties when the concealment is alleged to have occurred. *Id.* If the parties are contracting, a duty arises when there is a disparity of bargaining power or expertise. *Id.* 223 Kan. at 760, 576 P.2d at 679. The obligation also arises if the parties are in a fiduciary relationship. *Id.* at 760, 576 P.2d at 679.

■ In this case, there is no fiduciary relationship between the parties. Similarly, there is no inequality of conditions, circumstances, bargaining power or expertise of the parties. PDQ has cited no case which cre-

ates a duty, legal or equitable, to disclose an intent to terminate all business relations under the circumstances existing in this case. Thus, the motion for summary judgment of PDQ's fraud claim based upon the silence of IDWG, Osmers and Jones is granted, and the claim dismissed.

### IX. Conversion Claims Against Larry Denton and AHP

Defendants Larry Denton and AHP assert that IDWG's claims of conversion against them must fail because there exists only a simple contract claim and that the taking of overages was not the exercise of ownership over IDWG's property. This court finds that neither defendant can point to an absence of evidence to support IDWG's conversion claim.

 Conversion is an unauthorized assumption and exercise of a right of ownership over goods or personal chattels belonging to another, to the alteration of their condition or the exclusion of the owner's rights. *Moore v. State Bank of Burden*, 240 Kan. 382, 386, 729 P.2d 1205 (1986), *cert. denied*, 482 U.S. 906, 107 S.Ct. 2484, 96 L.Ed.2d 376 (1987); *Watkins v. Layton*, 182 Kan. 702, 324 P.2d 130 (1958). Plaintiff IDWG has set forth evidence that the overages were not the property of PDQ and that both Larry Denton and AHP deprived IDWG of the use of the overages. Again, ownership rights in the overages remains a genuine issue of material fact. A reasonable juror could find that the overages were the property of IDWG, and that AHP, through its owners Larry Denton and Campbell, received the overages and sold them to other wholesale prescription drug distributors or retail prescription drug customers without authorization to the exclusion of the rights of IDWG.

Defendants Larry Denton and AHP further argue that plaintiff cannot claim conversion when it stems from a dispute as to the terms of an agreement or relationship between the parties and cite *Smith v. Quivira Land Company* in support of this contention. 153 Kan. 794, 113 P.2d 1077 (1941). *Smith* simply does not stand for such a proposition. In *Smith*, the court held that the defendant

could not be found guilty of conversion because it at no time confiscated, damaged, refused possession, or made any claims to the title of plaintiff's property. *Id.* at 801, 803, 113 P.2d at 1081, 1083. In stark contrast to *Smith*, IDWG alleges and has some evidence to show AHP and Larry Denton confiscated and asserted rights of ownership in IDWG's property, the overages.

### IX. Conversion Claim Against Mark Denton

Defendant Mark Denton argues that there is no evidence to support a claim of conversion against him because he never claimed or assumed rights of ownership in the overages and he at all times acted in good faith upon direction from his father. He further argues that an agent cannot be liable for conversion unless he both negotiates the transaction and transfers the possession of chattel in consummation of the transaction. For the reasons set forth below, summary judgment on the conversion claim is denied on all grounds.

 Under Kansas law, an agent need not assert an ownership interest in property to be liable for conversion:

> In analyzing the rights of the appealing parties, we start with the common law rule that a factor or commission merchant who receives property from his principal, sells it under the latter's instructions and pays him the proceeds of the sale, is guilty of a conversion if his principal had no title thereto or right to sell the property, and generally the factor may not escape liability to the true owner for the value of the property by asserting he acted in good faith and in ignorance of his principal's want of title.

*North Central Kansas Production Credit Ass'n v. Washington Sales Co., Inc.*, 223 Kan. 689, 577 P.2d 35, 41–42 (1978). Mark Denton, as an agent of PDQ was involved in the taking, storing, and eventual sale of overages. Even though at all times he may have been acting at the explicit direction of a principal, he may still be held liable in conversion. The conversion claim against him may not be dismissed on this ground.

Similarly, under Kansas law an agent is not free of liability simply because he acted in good faith. The Tenth Circuit has examined an agent's liability for conversion under Kansas law and has held that, "Although subjecting an innocent commission agent to conversion liability may seem harsh, Kansas courts consistently have declared that the agent's good faith or lack of knowledge of the security interest is not a defense." *First Nat. Bank of Amarillo v. Southwestern Livestock, Inc.,* 859 F.2d 847, 850 (10th Cir.1988) (citing *DeVore v. McClure Livestock Commission Co. Inc.,* 207 Kan. 499, 503, 485 P.2d 1013, 1016–17 (1971); *First National Bank and Trust Co. v. Atchison County Auction,* 10 Kan.App.2d 382, 389, 699 P.2d 1032, 1038 (1985)). Conversion is a strict liability tort. *See Centerre Bank v. New Holland Div. of Sperry Corp.,* 832 F.2d 1415, 1423 (7th Cir.1987); *United States v. Gallatin Livestock Auction, Inc.,* 448 F.Supp. 616, 621 (W.D.Mo.), aff'd per curiam, 589 F.2d 353 (8th Cir.1978). Although Mark Denton's knowledge and beliefs as to the ownership of the overages remains an issue of fact, even assuming he had a good faith belief that PDQ was the true owner of the overages, he may still be liable in conversion. Thus defendant's summary judgment motion is denied on this ground.

Finally, defendant cites to the Comment to the Restatement (2d) of Torts § 233(3) for the proposition that an agent who innocently receives or transports stolen goods and has no other part in the transaction is not responsible for conversion by the agent's principal. Defendant cannot, however, point to any Kansas case that has so held. For purposes of this motion, however, it is unnecessary to decide if defendant's position is consistent with Kansas law. IDWG specifically alleges and has set forth sufficient evidence for purposes of this motion to show that Mark Denton knowingly transported and caused to be transported more than $5,000 worth of bottle overages. The motion for summary judgment is denied on this ground.

### X. Conclusion

**IT IS THEREFORE ORDERED BY THE COURT** that IDWG's motion for leave to file supplementary memorandum in opposition to defendant's motions for summary judgment (Doc. # 241) is granted.

**IT IS FURTHER ORDERED** that Larry Denton's motion for summary judgment (Doc. # 215) is denied.

**IT IS FURTHER ORDERED** that the motion of Camden Enterprises, Hurst–Asher Drug, Inc., and Pharmacy Dispensing Quantities, Inc. for summary judgment (Doc. # 217) is denied.

**IT IS FURTHER ORDERED** that the motion of Mark Denton for summary judgment (Doc. # 211) is denied.

**IT IS FURTHER ORDERED** that the motion of Independent Drug Wholesaler's Group, Inc., cross-defendant Chris Osmers and cross-defendant Brad Jones for summary judgment (Doc. # 209) is granted in part and denied in part.

**IT IS SO ORDERED.**

### MEMORANDUM AND ORDER ON RECONSIDERATION

This matter comes before the court on the motion of Independent Drug Wholesalers Group, Inc. ("IDWG") for reconsideration (Doc. # 260) of the court's order, 833 F.Supp. 1507, dated August 27, 1993, denying plaintiff's motion for summary judgment regarding an alleged promise to negotiate. The court held a telephone hearing with counsel on this motion (as well as defendants' motion to reconsider) on October 5, 1993, at which time the court denied the motion in part and took it under advisement in part. For the reasons set forth below, the court now denies in full plaintiff's motion for reconsideration.

For purposes of this motion, the court incorporates by reference the facts and findings of its August 27th order as well as those set out on the record of the October 5th hearing.

The issue which remains to be decided by this court is whether the defendants could, as a matter of law, have reasonably relied on a promise by IDWG to negotiate continued business with PDQ after the rework period. After considering the issue in light of the most recent oral and written arguments of

both plaintiff and defendants, the court cannot find that, as a matter of law, PDQ could not reasonably rely on the alleged promise of IDWG to negotiate continued business relations. As this is consistent with the court's original finding, plaintiff's motion for reconsideration must be denied.

■ Plaintiff relies on three cases, *Phillips and Easton Supply Company v. Eleanor Int'l Inc.*, 212 Kan. 730, 512 P.2d 379 (1973), *Weil and Associates v. Urban Renewal Agency*, 206 Kan. 405, 479 P.2d 875 (1971), and *United States v. Orr Construction Co.*, 560 F.2d 765, 769 (7th Cir.1977), for the proposition that agreements to negotiate are inherently incomplete and vague and are not, as a matter of law, enforceable under contract law. Plaintiff then concludes that if an agreement to negotiate is not enforceable, it cannot be reasonably relied on as a matter of law.[1]

The court disagrees with IDWG's interpretation of the above-mentioned cases. The court finds that these cases stand for the proposition that an agreement to make *a contract* in the future is unenforceable. In other words, these cases hold that an agreement to agree is unenforceable because courts cannot engage in the practice of supplying the terms of an actual agreement that the parties promise to reach in the future. *See, e.g., Orr Construction Co.*, 560 F.2d at 765. These cases deal with an issue close to but significantly different from the issue before this court. In this case, the court is not faced with evidence of an agreement between IDWG and PDQ to make a contract in the future, the terms of which must now be gleaned, but rather with evidence of a specific promise to negotiate an agreement at a later date, which arguably was designed to and did cause the promisee either to take or to refrain from taking certain actions, and which the promisor never intended to keep.

Plaintiff also cites to *Staheli v. Kauffman*, 122 Ariz. 380, 595 P.2d 172 (1979), for the proposition that a promise to negotiate is too

indefinite a promise upon which a person can reasonably rely. *Staheli*, however, is unpersuasive, because it too deals with reliance on a promise to *reach* an agreement. In *Staheli*, the two parties involved were negotiating a partnership agreement but eventually failed to agree on its terms. The court found that "appellants did not have the right to rely on the appellees' promise to work out a partnership because such a promise is not sufficiently definitive to determine what was being promised." *Staheli*, 595 P.2d at 175. This case poses a different problem. It is not simply that the promisee allegedly relied on a nebulous promise which never was fulfilled, it is that the promisor allegedly never intended to fulfill a specific promise to negotiate and knowingly led the promisee down a primrose path which it otherwise would not have taken. Whether under the circumstances of this case reliance on that promise was reasonable is a question of fact not of law.

The court recognizes that this claim presents problems of proof for the defendants. It may well be that, at trial, defendants cannot show that they reasonably relied given the strained relation of the parties at the time of the rework. Defendants also may not be able to show they suffered any damages as a result of their reliance on a promise to negotiate, because such a promise did not guarantee a business relationship would continue between the negotiating parties. If so, plaintiff may make its Rule 50 motion at trial.

■ A motion to reconsider gives the court an opportunity to correct manifest errors of law or fact and to review newly discovered evidence. *Harsco Corp. v. Zlotnicki*, 779 F.2d 906, 909 (3d Cir.1985), *cert. denied*, 476 U.S. 1171, 106 S.Ct. 2895, 90 L.Ed.2d 982 (1986). A motion to reconsider will be granted if the court has obviously misapprehended a party's position or the facts, or mistakenly has decided issues not presented for determination. *See Refrigera-*

---

1. The court notes that if an agreement itself is unenforceable, it docs not automatically follow that reliance on the agreement is unreasonable. A promise or representation of a present intention may reasonably be relied on even when the promise itself cannot be enforced. *See* W. Page Keeton et al., Prosser & Keeton on Torts § 109, at 763–4 (5th ed. 1984). There must be an independent inquiry as to whether reliance is reasonable.

*tion Sales Co. v. Mitchell–Jackson, Inc.,* 605 F.Supp. 6, 7 (N.D.Ill.1983), *aff'd,* 770 F.2d 98 (7th Cir.1985). The court has reviewed the law and the facts as they relate to the issues addressed in IDWG's motion for reconsideration. The court does not find that it has misapprehended the plaintiff's position or mistakenly decided issues not presented. Neither does it believe its original decision was erroneous.

**IT IS THEREFORE ORDERED BY THE COURT** that plaintiff's motion for reconsideration (Doc. # 260) is denied in its entirety.

**IT IS SO ORDERED.**