NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

OUTFRONT MEDIA LLC,
*Plaintiff/Appellee,*

*v.*

HART & ASSOCIATES ATTORNEYS & COUNSELORS AT LAW PC,
*Defendant/Appellant.*

No. 1 CA-CV 18-0605
FILED 12-5-2019

Appeal from the Superior Court in Maricopa County
No. CV2017-001782
The Honorable Timothy J. Thomason, Judge

**AFFIRMED**

COUNSEL

Dessaules Law Group, Phoenix
By Jonathan A. Dessaules, Jacob A. Kubert
*Counsel for Defendant/Appellant*

Iannitelli Marcolini, PC, Phoenix
By Claudio Eduardo Iannitelli, Jason Kelly Thomas
*Counsel for Plaintiff/Appellee*

## MEMORANDUM DECISION

Judge James B. Morse Jr. delivered the decision of the Court, in which Presiding Judge Kenton D. Jones and Judge Diane M. Johnsen joined.

**M O R S E**, Judge:

¶1          Hart & Associates Attorneys & Counselors at Law P.C. ("Hart") appeals the superior court's grant of summary judgment to Outfront Media LLC ("Outfront") in this breach of contract action. For the following reasons, we affirm.

### FACTS[1] AND PROCEDURAL BACKGROUND

¶2          In May 2016, Hart contracted with Outfront for billboard advertising in the Atlanta, Georgia area. The contract consisted of an "Advertiser Agreement" and an appended "Terms and Conditions of Advertising Service" (collectively "the Agreement"). The Agreement specified that Hart's advertising would be posted on fifteen of Outfront's billboards for an "advertising period" of four weeks, and then on twenty billboards for eleven "advertising periods" of four weeks each. Though Outfront's form agreement did not allow a client to cancel before the end of the contract's term, Hart specifically negotiated with Outfront to include a provision that would allow Hart to cancel the Agreement with 30 days notice after the sixth "advertising period." Despite the addition of this negotiated term, the Agreement retained Outfront's typical language reflecting that the contract was "non-cancelable." Prior to execution of the Agreement, an Outfront representative purportedly told one of Hart's employees that the billboard advertising would increase the call volume to Hart's "vanity number," a custom number created through a third-party vendor that would forward calls to Hart.

¶3          Hart paid for the first two advertising periods, but then stopped paying Outfront's invoices. Outfront and Hart began discussing

---

[1]     Because we are reviewing a grant of summary judgment, we recount the facts in the light most favorable to the non-movant. *United Dairymen of Ariz. v. Schugg*, 212 Ariz. 133, 140, ¶ 26 (App. 2006). Though we recognize some of these facts are disputed by Outfront, none of the disputes are material to its claim for breach of contract.

the past-due payments and attempted to negotiate a resolution of their dispute. Representatives of the parties met on December 1, 2016. Hart's chief executive officer ("CEO") attended the meeting and later described the following events in a declaration submitted on summary judgment:

> I stated that we were inclined to cancel the contract and return all billboards to Outfront at which point he offered to take back half the boards.

> Another representative of Outfront who was also present at this meeting falsely stated that it was not possible to cancel the contract. However, the contract expressly stated that "Hart & Associates ha[d] the right to cancel after 6 periods of advertising with a 30 day notice."

> I assumed that I had been clear in providing notice of the Firm's intention to cancel the advertising contract at the December 2016 meeting.

¶4   Another of Hart's employees who attended the meeting submitted a declaration saying that the CEO had "stated that he wanted to cancel the advertising."

¶5   About a month and a half after the December 1 meeting, Outfront's representative sent an email to Hart that read:

> [Hart's CEO], if I have offended you or your firm in any kind of way I would like to apologize because in no way was that my intent.

> If money is an issue please email me a cancelation email and we will cancel the campaign. I keep receiving compliments from my friends that live down south and in Gwinnett about how great your campaign looks and your placement. I hope you have been satisfied as well. I have a great deal of respect for you [Hart's CEO] and want to find a solution. That can only happen through communication and I would like any amount of time you are willing to give me in order to find that solution. Feel free to call my cell whenever.

¶6   Hart's CEO responded:

> Absolutely not. You have been a pleasure to work with. If anything, I owe you an apology. I am scrambling to

reorganize a few things and fight with the vanity number. I will call you tomorrow morning around 9 am. Have a good night.

**¶7** In February 2017, Hart followed up with another email in which Hart stated that its vanity number had not been working from September to December, and claimed that no calls were received in January and the first half of February. In the email, Hart "propose[d] that the original contract be amended" and offered to make a "good faith payment" of $15,000.00 in March, and "enter into a new payment schedule per the amended contract at the same time." Shortly thereafter, Outfront filed this action.

**¶8** Eventually, Outfront filed for summary judgment. Its argument was simple. Hart had received all of the billboard advertising it had contracted for but never paid for the final ten advertising periods.

**¶9** Hart opposed summary judgment, arguing that factual disputes existed regarding whether: 1) Hart effectively exercised its right to cancel when its representative told Outfront at the December 1 meeting that Hart was "inclined to cancel the Agreement"; 2) Outfront breached the Agreement first by failing to timely post the billboards and, therefore, its claim for damages must be reduced accordingly; and, 3) Outfront had fraudulently induced Hart to enter the Agreement by falsely claiming the billboards would cause Hart's call volume to rise.

**¶10** After briefing and oral argument, the superior court determined no issues of material fact existed, granted Outfront's motion for summary judgment, and awarded Outfront a portion of its attorney's fees and costs pursuant to the terms of the Agreement. Hart timely appealed, and we have jurisdiction pursuant to A.R.S. § 12-2101(A)(1).

## DISCUSSION

### I. Standard for Review

**¶11** We review *de novo* a grant of summary judgment, viewing the facts in the light most favorable to the party against which summary judgment was entered. *United Dairymen of Ariz. v. Schugg*, 212 Ariz. 133, 140, ¶ 26 (App. 2006).

**¶12** Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Ariz. R. Civ. P.

56(a).  In a contract case, the plaintiff bears the burden to demonstrate that a contract exists, its breach, and resulting damages.  *Thunderbird Metallurgical, Inc. v. Ariz. Testing Labs.*, 5 Ariz. App. 48, 50 (1967).  "If the evidence would allow a jury to resolve a material issue in favor of either party, summary judgment is improper."  *Comerica Bank v. Mahmoodi*, 224 Ariz. 289, 291, ¶ 12 (App. 2010).  "Put differently, the mere absence of a genuine dispute of material fact does not automatically entitle a plaintiff to judgment—the plaintiff must also demonstrate that the evidence entitles it to judgment as a matter of law."  *Wells Fargo Bank v. Allen*, 231 Ariz. 209, 213, ¶ 16 (App. 2012).  "To carry its burden of persuasion, a plaintiff who seeks summary judgment must submit 'undisputed admissible evidence that would compel any reasonable juror to find in its favor on every element of its claim.'"  *Id.* at ¶ 18 (quoting *Mahmoodi*, 224 Ariz. at 293, ¶ 20).

## II.    No Genuine Dispute as to Material Facts Precluded Summary Judgment

¶13         Hart argues that three issues of material fact precluded summary judgment.  Outfront responds that Hart's factual disputes are not material, and further objects to the admissibility of certain evidence on which Hart relies.  Even assuming all of Hart's evidence is admissible, we agree with the superior court that the record presents no dispute of any material fact.  We address each of Hart's alleged factual disputes in turn.

### A.    No Dispute Exists Regarding the Alleged "Cancellation" of the Agreement

¶14         "Notice of termination of a contract must be clear, positive and unequivocal."  *Thermo-Kinetic Corp. v. Allen*, 16 Ariz. App. 341, 345 (App. 1972) (citing *Shaw v. Beall*, 70 Ariz. 4, 7 (1950); 17(A) C.J.S. Contracts § 402, p. 488 (1963)).  "Evasive tactics and equivocal references to [concerns about the contract] can hardly be equated to notice of termination."  *Id.*

¶15         Viewing the facts in the light most favorable to the non-moving party, as noted, Hart's CEO stated that he told Outfront that he "was inclined to" cancel the Agreement.  Recognizing the inherent ambiguity in that statement, Hart argues that the declaration of the other employee who was present at the December 2016 meeting should serve to clarify the CEO's statement.  However, that employee only states that the CEO said he "wanted to cancel" the Agreement, not that he actually cancelled it.  Neither statement constitutes a "clear, positive and unequivocal" termination of the Agreement.  *Thermo-Kinetic Corp.*, 16 Ariz. App. at 345.  And, in any event, Hart has conceded that the other employee's

declaration was solely submitted to "rebut the charge that [the CEO] [ ] falsified his testimony." As we have already stated, our analysis assumes that the CEO actually stated that he was inclined to cancel the Agreement.

**¶16**  The word "incline" is defined, in relevant part, as "to lean, tend, or become drawn toward an opinion or course of conduct." *Incline*, Webster's Ninth New Collegiate Dictionary (1983). It can hardly be said that being "inclined to cancel" amounts to a clear effort to cancel the Agreement. If one is inclined to do something it necessarily suggests that the action has not yet been taken. The CEO's subjective belief that his statement would be sufficient to serve as an unequivocal cancelation is irrelevant to the question of whether the Agreement was effectively terminated and directly contradicted by the equivocation in what he actually said.

**¶17**  Moreover, the CEO's subsequent actions demonstrated he did not believe he had canceled the contract. Only six weeks after the December meeting, the CEO responded to an email from Outlook that requested clarification about whether Hart wished to cancel. The CEO responded "[a]bsolutely not," saying it was "a pleasure to work with [Outfront]," offering his apologies for the ongoing issues, and noting that he was attempting to resolve the technical problems with Hart's vanity number. *See Taylor v. State Farm Mut. Auto. Ins. Co.*, 175 Ariz. 148, 157 (1993) (noting that a contracting party's subsequent conduct may inform what the parties intended). Hart argues the CEO's response to the email was ambiguous, but we disagree. The only fair reading of the CEO's response is to say that he was "[a]bsolutely not" canceling the Agreement.[2] This reading is further buttressed by Hart's February 2017 email in which it sought to renegotiate the Agreement and enter into a new payment schedule. Accordingly, we agree with the superior court that there was no genuine dispute regarding whether Hart canceled the Agreement. *See Orme Sch. v. Reeves*, 166 Ariz. 301, 309 (1990) (stating that "affidavits that . . . are internally inconsistent . . . and similar items of evidence may provide a 'scintilla' or create the 'slightest doubt' and still be insufficient to withstand a motion for summary judgment" (citations omitted)).

---

[2]  Hart asserts that "[a]bsolutely not" was meant as a response to Outfront's representative's concern, stated in the email, about whether he had offended the CEO in some way. The CEO's email response cannot reasonably be interpreted in that way. *See supra* ¶¶ 5-6.

### B. Hart's Arguments Regarding Outfront's Performance Do Not Give Rise to a Dispute of Material Fact

**¶18** We may similarly dispense with Hart's argument regarding Outfront's supposed breach of the Agreement. Hart argues that there was a seventeen-day delay in posting the first set of billboards under the Agreement, and that such a breach would excuse its failure to pay. Outfront disputes that any delay occurred, but correctly points out that the Agreement expressly limits Hart's remedies for any delay. The Agreement states that if "[Outfront] fails to timely meet its posting requirements [under the Agreement], any resulting loss of advertising shall not be deemed a breach or termination of this Contract." Hart's remedies for any delay were to receive an extension to the advertising period.

**¶19** Hart does not argue that Outfront failed to keep Hart's advertising up for the required number of days, but instead argues that a delay of seventeen days in the initial posting relieves Hart of all further payment requirements under the contract. Even if true, such a delay would not create any dispute material to Outfront's breach of contract claim.

### C. Hart Fails to Demonstrate a Genuine Dispute of Material Fact as to Fraudulent Inducement

**¶20** Hart's final argument is that fraudulent misrepresentations by Outfront, that its billboards would increase the number of calls to Hart's vanity number, induced Hart to enter the Agreement. Assuming *arguendo* that such promises were made, the trial court correctly determined that any statement regarding the future benefits of the advertising campaign was "puffery."

**¶21** "In order that a representation constitute actionable fraud, it must relate to either a past or existing fact. It cannot be predicated on unfulfilled promises, expressions of intention or statements concerning future events unless such were made with the present intention not to perform." *Staheli v. Kauffman*, 122 Ariz. 380, 383 (1979) (citations omitted). Hart argues it had the right to rely on the alleged promise of increased call volume because Outfront supposedly had specialized knowledge about billboard advertising, relying on an Illinois case as support for this proposition. *Duhl v. Nash Realty, Inc.*, 429 N.E.2d 1267, 1273 (Ill. App. Ct. 1981) (quoting William L. Prosser, *Handbook of the Law of Torts* § 109, at 726-27 (4th ed. 1971)). *Duhl* stands for the principle that in certain scenarios where a seller has highly specialized knowledge, such as a physician giving medical opinions, a realtor appraising a house, or a jewelry expert giving

an opinion as to the value of a diamond, a buyer may rely on such opinions as if they were statements of fact. *Id.* Billboard advertisers are not analogous to physicians or expert jewelers. A statement regarding the efficacy of a billboard advertisement does not involve the same level of specialized knowledge as a physician giving a medical diagnosis. *E.g., Power v. Smith*, 786 N.E.2d 1113, 1119 (Ill. App. Ct. 2003) (distinguishing *Duhl* and finding that statements regarding the future "profitability of an endeavor" are not actionable). The principle outlined in *Duhl* is inapplicable to the scenario here and the alleged promise constitutes quintessential puffery. *See Hall v. Romero*, 141 Ariz. 120, 123-24 (App. 1984) (rejecting fraud claim based on statement that "you'll never find a better, more secure investment.").

**¶22**        Hart also alleges Outfront failed to disclose that it "controlled a disproportionate share of legal billboard advertising in metro-Atlanta and knew that Hart would be placed in direct competition for placement with" other law-firm advertising. This, Hart contends, could provide a factual basis for a jury to find that Outfront knew the advertising campaign would be ineffective despite telling Hart otherwise. But counsel for Hart conceded at oral argument that Hart never inquired about competitor advertising and, aside from the CEO's generalized and unsupported assertion, the record lacks any evidence that Outfront controls a "disproportionate share of the legal billboard advertising in metro-Atlanta." Arizona courts have held that conclusory declarations, without more, are insufficient to defeat a motion for summary judgment. *See Burrington v. Gila County*, 159 Ariz. 320, 325 (App. 1988); *see also Gesina v. General Elec. Co.*, 162 Ariz. 35, 38 (App. 1989). Regardless, Outfront's share of the metro-Atlanta law-firm advertising market is not relevant to the question of whether the alleged promise was puffery. This was an arms-length commercial transaction and Outfront was not generally obligated to disclose anything about its advertising agreements with other law firms. *See Cook v. Orkin Exterminating Co.,* 227 Ariz. 331, 334, ¶ 15 (App. 2011) (rejecting argument that a pest control company's specialized knowledge and expertise altered the arms-length nature of the transaction); *Universal Inv. Co. v. Sahara Motor Inn, Inc.*, 127 Ariz. 213, 215 (App. 1980) (noting that a duty to disclose only arises in the context of a special or confidential relationship between the parties). Even if we were to assume Outfront's billboards disproportionately hosted other law-firm advertisements, the result would be the same. In an arms-length transaction, a promise that an advertising campaign will have some generalized future benefit cannot support a claim of fraudulent inducement. *Staheli*, 122 Ariz. at 383.

¶23 The material facts in this case are undisputed. Hart and Outfront entered into the Agreement. Outfront fulfilled its responsibilities under the Agreement. Hart failed to pay for ten of the twelve advertising periods for which it contracted. Outfront presented sufficient evidence to prove its claim, and we agree with the superior court that Hart failed to present evidence or legal authority to support any viable defense. Accordingly, we affirm the court's grant of summary judgment in all respects.

### III. Attorney's Fees

¶24 Because we affirm the grant of summary judgment, we affirm the grant of attorney's fees.

¶25 Outfront asks for its attorney's fees and costs on appeal pursuant to the fee provision contained within the Agreement. The provision reads, in relevant part:

> In the event of legal action arising out of this Contract, [Outfront] shall be entitled to receive its reasonable attorneys' fees and out of pocket expenses.

¶26 Because we have affirmed summary judgment in favor of Outfront, we grant its request for its attorney's fees and costs on appeal.

### CONCLUSION

¶27 For the foregoing reasons, the superior court's judgment is affirmed in all respects, we deny Hart's request for fees and costs on appeal, and grant Outfront its request for fees and costs on appeal, contingent on compliance with Arizona Rule of Civil Appellate Procedure 21.



AMY M. WOOD • Clerk of the Court
FILED: AA